### IN THE UNITED STATES DISCTRICT COURT
### FOR THE DISTRICT OF MARYLAND
#### (Northern Division)

| | | |
|---|---|---|
| **STEPHEN COLFIELD** | * | |
| | * | |
| | * | |
| Plaintiff | * | |
| | * | **CIVIL CASE #:  1:12-CV-03544-WDQ** |
| vs. | * | |
| | * | |
| **SAFEWAY INC** | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT SAFEWAY INC.'S MOTIONFOR SUMMARY JUDGMENT

Respectfully Submitted,

*/s/ George A. Rose*

_____
George A. Rose, Esq.
Federal Bar No. 26086

Rose Law Firm, LLC
200 E. Lexington St. Suite 800
Baltimore, MD.  21202
Ph.410-727-7555
Fax.  443-320-0962
Email: grose@roselawfirm.net

Attorney for Stephen Colfield

## <u>TABLE OF CONTENTS</u>

**I.** <u>**STATEMENT OF THE CASE**</u>……………………………………………………… 1

**II.** <u>**STATEMENTS DISPUTED & UNDISPUTED OF FACTS**</u>……………………… …… 1

    A.  Mr. Colfield's Employment Background & Career as a Grocery Clerk……… …….2

    B.  Colfield Complained of Race Discrimination At Safeway And
        Assisted Co-Workers With Grievances and Race Discrimination
        Complaints At Safeway…………………………………………………….. …….2

            1.  Mr. Colfield Complained of Discriminatory Denial "Sunday"
               Work by Store Manager Larry Kuntz………………………………… …...3
            2.  Mr. Colfield Complaints of Discriminatory Harassment By Store
               Manager Larry Kuntz……………………………….…………..…… …….5
            3.  Mr. Colfield Complaint of Discriminatory Suspension On Account of
               Mr. Colfield Purchasing A DVD the day before it was due to go
               sale in the Store…………………………………….…………………….......  6
            4.  Mr. Colfield Complaint of Discriminatory Suspension On Account
               of Mr. Colfield Requesting and Having A Meeting with A Co-worker
               in the store manager's office, with the assistant store managers present……. 7

    C.  Safeway Took Adverse Disciplinary Actions Taken Against Mr. Colfield………….8

            1.  Suspension for Alleged Violation of Store Purchase Policy…………………8
            2.  Suspension for Alleged Work Place Violence Resulting From A
               Meeting Between Mr. Colfield And A Co-worker………………………….10
            3.  Safeway Fired Mr. Colfield After His EEOC Charges Were Dismisses...……11

    D.  Mr. Colfield Made EEOC Complaints and Assisted Co-Workers
        with EEOC Complaints Against Safeway………………………………………..12
            1.  Mr. Colfield Assisted Co-Worker with EEOC Claims And Grievances ….. 13

    E.  Mr. Colfield's White Co-Workers Who Violated Safeway Work
        Rules and Policies Were Give Favorable Treatment by Safeway………...................14

    F.  Safeway's Had a Plan To Terminate Mr. Colfield With His
        Transfer to the Owings Mills Store …………………………………………....16

**III.** **ARGUMENTS**………………………………….…………………………..17

    A.  Motion for Summary Judgment Standard of Review…………………………...17

    B.  Safeway is Not Entitled to Summary Judgment on Mr. Colfield
        Disparate Treatment Race Discrimination Claims for Disciplinary Actions ……19

        **1.**  Plaintiff has Evidence of A Prima Facie Case of Discrimination
            Regarding his Employment Suspensions and Termination**.**  …..............20

            a.  Mr. Colfield is An African American A Class of People
               Protected by Title and Section 1981………………………………..21
            b.  The prohibited conduct Alleged Against Mr. Colfield was
               comparable in seriousness to misconduct of White
               employees and the disciplinary measures enforced against
               Mr. Colfield were more severe than those enforced against
               the said  white employees. …………………………………… ..21

                i.  Comparable Serious Violation of Safeway's
                    Employee Purchase Policy, Mandatory Club Card
                    Policies, Smoking Policies …………………………... 21
                ii.  Violation of Safeway's Work Place Violence Policy ..… 22

            c.  Mr. Colfield Work Performance Was Consistent with
                Legitimate Expectation of Safeway ……………………………..24

        2.  Safeway' Reasons for the Suspension and Termination Were
            Pretext For Impermissible Discrimination……………………………...25

            a.  Same Race Decision Maker and Accused Does not
               undermined Pretext  in This
               Case………………………………...27

        3.  Safeway Was Motivated by Mr. Colfield's Race and Colfield's
            Protest and Participation Activities Opposing Race Discrimination
            when Safeway Suspend and Terminated Mr. Colfield's Employment. …29

    C.  Safeway Is not Entitled To Summary Judgment regarding Mr. Colfield's
        Claim for Disparate treatment Denial of Sunday Work Assignment **…………..** 31

    D.  Defendant is Not Entitled to Summary Judgment on Mr. Colfield
        Retaliations Claims In Violation of Title VII and Section 1981 ………………..34
        1.  Plaintiff Has Evidence to Establish A Prima Facie Case of Retaliation
            in Violation of Title VII and Section 1981……………………………... 35

a. Mr. Colfield Engaged In Protected Activities ………………….. 35

b. Mr. Colfield Suffered Adverse Employment Actions by
Safeway …………………………………………………… 36

c. Casual Connection Exist Between the Protected Activities
and the Adverse Action …………………………………… 36

   i. Intervening Pattern of Retaliatory Conduct Exist ……… 38

2. Safeway's Reasons for the Suspensions and Termination
Were Pretext For Retaliation  ………………………………….. 39

3. Mr. Colfield's Race And His Protest and Participation Against
Race Discrimination At Safeway Was the Real and Actual
Motivation for the Discriminatory Retaliation with Disciplinary
Actions Against Mr. Colfield. ………………………………… 40


IV.   **<u>CONCLUSION</u>**………………………………………………………..42

**IN THE UNITED STATES DISCTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| STEPHEN COLFIELD | * | |
| | * | |
| | * | |
| Plaintiff | * | |
| | * | **CIVIL CASE #:  1:12-CV-03544-WDQ** |
| vs. | * | |
| | * | |
| SAFEWAY INC | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**DEFENDANT SAFEWAY INC.'S MOTIONFOR SUMMARY JUDGMENT**

## I.      STATEMENT OF THE CASE

Mr. Colfield filed this case against Safeway in December 2012 for employment discrimination and retaliation due to his race as an African American and his opposition to what he reasonable believed to be Safeway's basis against African American employees, and/or his participation in EEOC activities against Safeway.  In this case, Mr. Colfield asserts that Safeway denied him holiday/Sunday work opportunity at double pay rate, suspended him twice and terminated his employment in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. Sections 2000e et seq., ("Title VII"), the Civil Rights Act of 1866 as amended, 42 U.S.C.§ 1981, ("Section 1981").

## II.      STATEMENTS DISPUTED & UNDISPUTED OF FACTS

### A.  Mr. Colfield's Employment Background & Career as a Grocery Clerk

Mr. Colfield is an African American who was born to parents of mixed race, his mother been a Caucasian and his father an African American. Mr. Colfield is a career grocery clerk who

began working as a grocery clerk with Giant Foods in 1993.  (*Colfield Affidavit, Attached hereto as Ex.1 ¶1)* At Giant he received many "Staffer of the Year" awards "for exceptional courtesy to Customers and Fellow Associates*".  (Giant Staffer of the Year Awards, Attached hereto as Ex.2)* Mr. Colfield has been married to his wife  for more than ten years and is well respected and admired in his community as an honest, peaceful and helpful Christian person. (Ex.1 *¶4)* During his employment at Giant, he became an active member of the labor union United Food and Commercial Workers Union, Local 27, ("Local 27"), and was proactive with assisting his co-workers with their grievances.  (Id. *¶5)*

On or about January 19, 2004, Mr. Colfield became employed with Safeway as a food clerk/cashier at Safeway's Pikesville Store in Baltimore County.  . (Ex.1 *¶5)* At Safeway, Mr. Colfield maintained his Local 27 membership under a Collective Bargaining Agreement (CBA) between Local 27 and Safeway.  (Id.) In 2006 Mr. Colfield was elected as shop steward for Local 27 as position he held until 2010 when he was transferred to the Ellicott City store. (Id.)

Throughout his career as a grocery clerk, Mr. Colfield was known to be exceptional in the performance of his duties. (Ex. 2) At Safeway Mr. Colfield annual performance evaluation shows that he performed satisfactorily. *(March 30, 2011, Colfield 2010 Annual Performance Evaluation, hereinafter, Ex.3)*

### B.  Colfield Complained of Race Discrimination At Safeway And Assisted Co-Workers  With Grievances and Race Discrimination Complaints At Safeway

As a shop steward, Mr. Colfield was the first line of contact for employees with grievances and complaints against store managers, from 2006 through 2009 at the Pikesville and Owings Mills store. (Ex.1 *¶7)* During this time, Mr. Colfield observed many instances in which

the store managers were biased against African American employees. (Id.) Mr. Colfield observed that store managers treated African American employees less favorably than their White co-worker in the enforcement of Safeway employment rules and policies. (Id.)

### 1. Mr. Colfield Complained of Discriminatory Denial for Work Opportunities on Sundays where the rate of Pay was Double.

On or about March 25, 2010, Plaintiff sustained an injury on the job, and on or about March 30, 2010, the Pikesville store closed.   (Ex.1. *¶10)* (Ex.6 *¶3-4)* Plaintiff was then transferred to the Ellicott City store. (Id.) The store manager at the Ellicott City store manager was Mr. Larry Kuntz, a Caucasian. (Id.)

On or about June 16, 2010, Mr. Colfield went on injured workers compensation leave, and returned from leave in September 2010. (Ex.6 *¶3-4)* Upon his return to work, Mr. Colfield sought reasonable accommodation due to his injury and was placed on light duty.  (Ex.1 *¶11)* When Colfield requested reasonable accommodation, Ms. Graham expressed concern to Mr. Kuntz that Mr. Colfield may complain that "he was denied an accommodation".  *(May 20, 2011 Email from Karen Graham, herein after Ex. 4)* Ms. Karen Graham directed that Mr. Kuntz take no action regarding Mr. Colfield's employment without clearing it with her. *(May 18, 2011 Karen Graham Email, hereinafter, Ex. 5)*

In January 2011, Mr. Colfield complained to Ms. Graham that store manager Larry Kuntz had decided that Mr. Colfield would no longer be allowed to work Sundays allegedly because of Mr. Colfield's light duty status. (Ex.1 *¶12)* Mr. Colfield complained that Mr. Kuntz permitted white food clerks/cashiers, Tiffani Mertes and Crystal Adams, who were also on light duty status, to work Sundays. (September 2012 Karen Graham Declaration, hereinafter Ex. 6 *¶5)* *(EEOC Charge of Discrimination, Charge No. 532-2021-00052, herein after Ex.7)* Mr. Colfield

also complained that Mr. Kuntz failed to observed Mr. Colfield's light duty restrictions and gave

Mr. Colfield work assignments that aggravated Mr. Colfield's injuries.  (Ex.1 *¶12-13)* (Ex.7)

According to the CBA between Safeway and Local 27, "[w]ork performed on Sunday

will be compensated at double (2) the employee's rate of straight time pay."  The CBA further

states, "[i]n the Grocery Department Sunday and holiday work shall be assigned on a rotating

basis by seniority within classification and ability to do the work considered. In the event the

Employer cannot schedule the necessary number of employees on a voluntary basis, then the

employees in reverse order of seniority shall be obligated to work.  Sunday work shall be

isolated and shall not be part of the basic work week." *(Sections 6, and 12 of the CBA*

*agreement, hereinafter Ex.8)*

Safeway did not accept and investigate Mr. Colfield claim of Sunday work schedule

denial as a discrimination complaint, until after Mr. Colfield filed complaint of discrimination

with the EEOC.  (Ex.6 *¶5) (Dkt. No. 88-10 ¶14)* Safeway explained the difference in treatment

of Mr. Colfield, stating that: "[r]isk Management would not pay the overtime rate for Colfield to

work on Sundays", and "that if Mertes and Adams were scheduled to work Sundays while on

light duty, it was in error." *(Safeway Position Statement, EEOC Charge of Discrimination,*

*Charge No. 532-2012-01776, herein after Ex.9)* Next, Safeway claimed that: "Tiffany Mertes

had seniority to Mr. Colfield, and therefore pursuant to the Union 27 Agreement Ms. Mertes was

always given preference over Mr. Colfield for light duty work on Sundays." *(Safeway Position*

*Statement, EEOC Charge of Discrimination, Charge No. 532-2012-00052, herein after Ex.10)*

(Safeway" Light Duty Practice, hereinafter, *Ex.11)* However the CBA states: "In the Grocery

Department Sunday and holiday work shall be assigned on a rotating basis by seniority within

classification and ability to do the work considered."  (Ex.8) Lastly, Safeway claimed that Mr. Colfield was denied Sunday working opportunities due to restrictions from his doctor. *(Dkt. No. 88-10 ¶6)*

## 2. Mr. Colfield Complaints of Discriminatory Harassment Against Store Manager Larry Kuntz

On or about August 22, 2011, Mr. Colfield's light duty restrictions ended and Mr. Colfield resumed the full functions of his job as a food clerk.  (Ex.1 *¶12) (Ex.6 ¶3)*, Although Mr. Colfield was not the elected Local 27 shop steward at the Ellicott City store; employees would approach Mr. Colfield with grievances and questions, or requested his assistance with work issues and complaints. (Id.) Mr. Kuntz was not pleased by these occurrences and severely restricted Mr. Colfield's interactions with co-workers.  (Id.) Mr. Kuntz also started giving Mr. Colfield work assignments to clean up dead mice around the store and clean up filthy trash from the trash compactor and trash located outside the store.  (Id.) This was the first in twenty one years of been a food or produce clerk that Mr. Colfield was given these types of assignments. (Id.)  Mr. Colfield protested directly to Mr. Kuntz against Mr. Kuntz bias actions and discriminatory treatment because of Mr. Colfield's race and contrasted Mr. Kuntz overlooking white co-workers while disciplining African Americans for work rule violations.  (Id.)

On or about September 28, 2011, Mr. Colfield complained to Ms. Graham, about discriminatory harassment by Mr. Kuntz against Mr. Colfield and Mr. Mark Robin, a Jewish employee who brought an EEOC claim against Safeway. (Ex.1 ¶14) (Dkt. No. 88-10 ¶7) Mr. Colfield also complained to Ms. Graham about the continuing denial of overtime, the assignments to clean up dead mice and garbage in and outside the store, and Mr. Kuntz severely restricting Mr. Colfield interactions with co-workers.  (Ex.1 ¶14) The following day Mr. Kuntz

issued a performance write up to Mr. Colfield. (Id.)

On or about October 27, 2011, Mr. Colfield filed a grievance with Local 27 for discriminatory Harassment against Mr. Kuntz. (Dkt. No. 88-10 ¶10) On or about November 1, 2011, the grievance was forward to Ms. Graham from Ms. Madert, to investigate. (Lucy Madert Email Regarding Colfield' Harassment Grievances, hereinafter Ex. 12) When Ms. Madert received the grievance, she knew that Mr. Colfield was claiming discriminatory harassment base on race. (Madert Deposition Transcript, hereinafter Ex.13 at 35-36)

### 3. Mr. Colfield Complained of Discriminatory Suspension On Account of Mr. Colfield Purchasing a DVD the Day Before It Was Due To Go On Sale in the Store.

On December 13, 2011, Mr. Colfield was suspended by Mr. Kuntz for an alleged violation of Safeway's Store Purchase policy in connection with a DVD purchased by Mr. Colfield on December 12, 2011. (December 13, 2011, Confirmation of Performance, hereinafter Ex. 14) The DVD was set to be released for sale on December 13, 2111. Mr. Colfield was not aware that the DVD was not available for sale. (Ex.1 ¶19)) Mr. Colfield was assisted with the purchase by cashier, Tiffany Mertes, who checked out the DVD without indicating any alerts or Caucasian that the DVD was not available for sale. (Tiffany Mertes Statement regarding DVD, hereinafter, Ex. 15) Ms. Mertes reported the sale to Mr. Kuntz and Mr. Colfield was immediately suspended by Mr. Kuntz. Mr. Colfield protested to Mr. Kuntz that the action was retaliation due to Mr. Colfield's October 2011, EEOC charge of discrimination; and, that no action was taken against Mertes who checked out the DVD that Safeway claim was clearly marked "Not for Sale". (Dkt. No. 88-12, ¶3) Mr. Colfield referred Mr. Kuntz to Mr. Colfield's 2007 suspension and termination for assisting co-worker, Mark Prince with a return purchase. (Ex.18) (Ex.1 ¶18)

Mr. Colfield was however suspended for three weeks without pay and recommended for termination in connection with this purchase.   (Graham Email regarding Stephen Colfield Suspension, hereinafter Ex.16 at 2) After filing grievance and reporting Safeway's action to the EEOC, as updates to his charges, Mr. Colfield was reinstated and transferred to the Owings Mills store on or about January 3, 2012.   (Dkt. No. 88-12, ¶21)

        **4.   Mr. Colfield Complaint of Discriminatory Suspension Arising Out of A Meetings Requested By Mr. Colfield with A Co-worker in the store manager's office, with the assistant store managers present.**

During the week of April 11, 2012, Mr. Colfield was approached by the store's shop steward, Don Perdoe, and assistant manager, Mike Deinlien with information that store manager Jimmy Bennett planned to fire Mr. Colfield that week.  (Ex.1 ¶24)  Earlier, on April 4, 2012, Mr. Colfield has written to the EEOC providing updated information regarding his October 2011 EEOC Charges. (Ex.1 - Attachment A) On April 24, 2012, Mr. Colfield attended a fact-finding meeting at the EEOC regarding the charge of discrimination he had filed in October 2011 against Safeway.  (Ex.1 ¶25)  On April 25, 2012, Robert Wesche, a white co-worker, told Mr. Colfield Tia Person, an African American food clerk, was going to make a report against Mr. Colfield to HR because Mr. Colfield was allegedly making derogatory statements about Ms. Person to other employees.  (Id.) In response, Mr. Colfield went to the store manager's office and requested to see Ms. Person about the allegations. (Id.) The assistant store managers, Mike Deinlien, and Angela Corpew were present when Ms. Person came   in   for   the   meeting.  (Id.) After a brief heated exchange with Ms. Person, Mr. Colfield hurried out of the office to avoid an escalation. As Mr. Colfield tried to leave the room, Ms. Person blocked his path to the doorway, causing Mr. Colfield and Ms. Person to touch shoulders as Mr. Colfield maneuvered to leave the room.  (Id.)

Mr. Colfield was then called back to the office and suspended pending an investigation. (Id.) Mr. Colfield protested to Mr. Deinlein and Ms. Corpew that the incident was used as a setup to suspend Mr. Colfield because of his EEOC activities against Safeway. (Id.) (Ex.1-Attachment C)

### C.  Safeway Took Adverse Disciplinary Actions Against Mr. Colfield

Defendant carries out its human recourse functions for the Pikesville, Owings Mills and Ellicott City through its human resources and labor relations offices or/officer located at its Eastern District office in Lanham Maryland. *(Graham Deposition Transcript, hereinafter Ex. 17 at 7-8)* These officers included Tim Mathews, the HR manager, who is Caucasian, (Id.) Lucy Madert, the then labor relations manager, and Ms. Graham, an African American, who was the HR Advisor.  (Id. at 111)  In 2010 Safeway transferred Ms. Graham to District 82 when Plaintiff was at Ellicott City and no longer a Local 27 shop steward.   (Dkt. No. 88-10, ¶3)

Mr. Mathews, Ms. Madert and Ms. Graham share the responsibility for making the decisions about disciplinary actions and each participated in the decisions to discipline Mr. Colfield. (Ex.17 at 71-72) (Dkt. No. 88-12, ¶18)  However, disciplinary action against food clerks and cashiers is initiated by the store managers, using the "Conformation of Performance" form. (Ex. 14)

### 1.  Suspension for Alleged Violation of Store Purchase Policy

On or about March 15, 2007, Mr. Colfield was suspended without pay for witnessing or assisting a co-worker, Mark Prince, return some items that Mr. Prince had purchased. (Mark Prince Investigative Report, hereinafter Ex. 18), Although Mr. Colfield was an innocent participant in Mr. Prince's scheme, on or about April 7, 2007, Mr. Colfield was fired over the incident.  (Id.) Mr. Colfield filed and successfully pursued a grievance against his firing.  As a

result, on or about August 15, 2007, Mr. Colfield was reinstated in his job as a food clerk at Safeway.  He was also transferred  to Safeway's Pikesville store #1994, where he remained a shop steward. (Id.) (Dkt. No. 88-12, ¶¶19-20)

On December 13, 2011, Mr. Colfield was suspended by Mr. Kuntz for alleged violation of Safeway's employee purchase policy.   (Ex. 14) Safeway claimed that Mr. Colfield's purchasing of a DVD the evening before it was to go on sale in the store, violated its employee store purchase police, which states: "All employees, their friends and family members shall be treated as other customers. At no time are they to be extended preferential treatment." (Dkt. No. 88-10, Exhibit E)

 On December 12, 2011, Mr. Colfield purchased a DVD at Safeway for $26.99.  Mr. Colfield was assisted with the purchase by his white counterpart, cashier, Tiffany Mertes, who scanned the DVD without override or any alerts that it was not available for sale.  (Ex. 15) Mr. Colfield did not conceal his purchase of the DVD and is a frequent consumer of Safeway's DVDs. (Ex.1 – Attachment D at 1) No actions were taken against Tiffany Mertes who scanned the DVD and process Mr. Colfield transaction. (Dkt. No. 88-10 ¶15) Safeway suffered no penalty or loss as a result of the purchase and Mr. Colfield obtained no benefits from the purchase. (Ex. 16)

Mr. Colfield was suspended for three (3) weeks and Safeway also sought to terminate his employment over the incident. (Ex. 16) Consequently, Mr. Colfield had to seek unemployment insurance benefit to support his family over the December holiday season.  (Division of Unemployment Determination, hereinafter Ex. 19) In December 2011 Safeway was asked to "Provide a copy of the policy regarding the purchase of video purchases prior to release to the

public, and the signed acknowledgment", in response to Mr. Colfield's unemployment benefit claim. On January 9, 2012, Ms. Graham sent an email to Mr. Matthews requesting a copy of the Employee Purchase Policy. Mr. Matthews responded, "No such policy is available". (January 1, 2012 Graham Email, hereinafter Ex. 20) However, Ms. Graham produced a document title "Employee Store Purchases, and alleged that Mr. Colfield violated "See #2 All employees, their friends and family members shall be treated as other customers. At no time are they to be extended preferential treatment" (January 1, 2012 Graham Email, hereinafter Ex. 21) The State Unemployment Division determined that Mr. Colfield's purchasing of the DVD the evening before it was due to go on store shelves for sale, did not constitute misconduct in connection with his work, and awarded Mr. Colfield unemployment benefit. (Ex. 19)

## 2. Suspension for Alleged Work Place Violence Resulting From A Meeting Between Mr. Colfield And A Co-worker.

On or about April 25, 2012, Mr. Colfield was suspending for alleged work place violence after having a meeting with a co-worker in the store managers office. (Ex.1 – Attachment C) Mr. Colfield had requested the meeting with Ms. Person to clarify information that Ms. Person was about to lodge a complaint against Mr. Colfield to HR. Soon after Ms. Person and Mr. Colfield began discussing the issues, they both became agitated and Ms. Person started to become confrontational. (Id.) Mr. Colfield sensed that he was been set up when Ms. Pearson started to escalate the situation to provoke physical confrontation and assistant store manager Deinlein grabbed Mr. Colfield's shoulder. (Id.) Coming on the ells of his EEOC fact finding on April 24, 2015, Mr. Colfield sensed that he was been entrapped and sought to leave the room. (Id.) As Mr. Colfield tried to leave the room, Ms. Person blocked his path causing Mr. Colfield and Ms. Person to bump shoulders as Mr. Colfield left the room. (Id.) At no time was

Mr. Colfield violent, intimidating or threatening towards Ms. Person.  (Id.)  Instead Ms. Person was instigating Mr. Colfield. (Id.) However, assistant store managers, Deinlien and Corpew wrote and or signed exaggerated statements with false information about the about the incident and blamed Mr. Colfield.  (Ex.1, Attachment D) A few months later, Mr. Deinlien was fired for stealing cash. (Dkt. No. 88-10 ¶48) Deinlien also reported to employees that he was coerced during the investigation to make the claim that Mr. Colfield pushed him.  (Tony Mack Affidavit, hereinafter, Ex.22 ¶5, Attachment B) Ms. Person also reported to employs that Mr. Colfield did not push her and was not violent or threatening to her during the April 25, 2012 incident. .  (Id. ¶6) (Anthony Wade Affidavit, hereinafter, Ex.23 ¶5)

### 3.  Safeway Fired Mr. Colfield After His EEOC Charges Were Dismissed

On May 2nd and 3rd, 2012, human resources manager Tim Matthews sent an letters to the EEOC "to update you on a new development involving Stephen Colfield".  (Tim Matthews May 2012 EEOC Letters, hereinafter Ex.24) The letters informed the EEOC that Mr. Colfield "loudly and aggressively confronted two managers and a coworker" and was suspended, pending investigation, for work place violence.  (Id.) On June 4, 2012, Mr. Colfield sent an email to attorneys seeking representation with his EEOC claim against Safeway and reporting about other employees with discrimination claims against Safeway.  (Ex.1 – Attachment D) The email was forwarded to Ms. Graham who was defending Safeway against Mr. Colfield's EEOC claim. (Dkt. No. 88-10, ¶35) On June 8, 2012 labor relations manager Lucy Mertes send an email inquiring about Mr. Colfield's EEOC complaint. (Mertes June 08 2012 Email, hereinafter Ex.25) On June 14, 2015Ms. Mertes met with Mr. Colfield for the first time since his April 25 suspension. (Mertes June 14, 2012 Grievance Meeting Notes, hereinafter Ex.26) Here for the

first time Mr. Colfield learn about the specific allegations against him, in relation to his April 25, 2012, meeting with Ms. Pearson. (Ex.1 Attachment F)

On or about July 9, 2012, Ms. Graham sent a letter to the EEOC changing Safeway's previous position about Mr. Colfield's claim of discrimination for denial of Sundays work schedule. (Graham July 9, 2012 EEOC Letter, hereinafter Ex.27) On or about July 11, 2012, Mr. Colfield received a "no probability cause" determination by the EEOC pertaining to Mr. Colfield charges of discrimination. On July 13, 2012, Mr. Colfield filed a new EEOC charges, claiming discrimination due to his April 25, 2012 suspension.  (July 13, 2012 Charges of Discrimination, hereinafter Ex.28)  On or about July 16, 2012, Mr. Colfield received notice from Defendant Safeway that Mr. Colfield was terminated from his employment "based on circumstances surrounding suspension". (July 16, 2012 Colfield Termination Letter, hereinafter Ex.29)

### D.  Mr. Colfield Made EEOC Complaints and Assisted Co-Workers with EEOC Complaints Against Safeway

On or about October 15, 2011, Mr. Colfield filed Equal Employment Opportunity Commission ("EEOC") charges of discrimination against Safeway pertaining to the denial of overtime work, retaliatory assignments and other discriminatory actions by Mr. Kuntz.  (Ex.10) On or about October 25, 2011 Mr. Colfield notice of charges of discrimination against Safeway was sent to Ms. Graham.  (October 25, 2011 EEOC Notice of Charges to Graham, hereinafter Ex.30) Ms. Graham was the lead or point person for Safeway's response and defense against Mr. Colfield' EEOC charges.  (Letter Authorizing EEOC to communicate with Graham, hereinafter Ex.31) On or about March 23, 2012 Ms. Graham wrote the EEOC stating that she never received a copy of the Charges and needed time to investigate before attending a fact finding conference on April 11, 2012.  (March 23, 2012 Graham Letter,

hereinafter, Ex.32).  The fact finding conference was then rescheduled for April 24, 2012.  On April 4, 2012, Ms. Graham met with Mr. Kuntz about Mr. Colfield's allegations regarding his claims of race discrimination in relation to the denial of Sunday work, oppressive assignments and disciplinary write up. (April 4, 2012 Graham Investigation Notes, hereinafter Ex.33)  During this time Mr. Colfield was getting witness statements, updating the EEOC with information about his claims and openly assisting other employees with EEOC claims.(Ex.1)

On or about July 11, 2012, Mr. Colfield received a "no probably cause" determination by the EEOC pertaining to Mr. Colfield's charge of discrimination against Safeway.  (July 13, 2012 EEOC Intake Notes, hereinafter Ex.34)  On July 13, 2012, Mr. Colfield filed a new charge of discrimination against his discriminatory suspension. (July 13, 2012 Charges of Discrimination, Hereinafter Exhibit Ex.35)  On or about July 16, 2012, Mr. Colfield received notice from Safeway that Mr. Colfield was terminated from his employment "based on circumstances surrounding suspension". (Ex.29)

## 1. Mr. Colfield Assisted Co-Worker with EEOC Claims And Grievances

After Mr. Colfield was transfer to the Owings Mills store in January 2012, he was assigned to work as a produce clerk with African American, Maria Jones and the produce manager and his direct supervisor.  (Ex.1 ¶21) Soon thereafter, Ms. Jones related to Mr. Colfield that store manager Jimmy Bennett disclosed that he was transferred to Owings Mill with a plan to fire Mr. Colfield and undermine Mr. Colfield's EEOC claim, since both Bennett and Colfield are African Americans.  (Id.)  (February 25, 2012 Maria Jones Statement, hereinafter Ex.36) After Ms. Jones made this disclosure to Mr. Colfield, Mr. Bennett began writing up Ms. Jones and Mr. Colfield began assisting her with her grievances. (Ex.1 –Attachment A) On one occasion

Mr. Colfield met with Mr. Bennett pertaining to disciplinary actions that Mr. Bennett issued against Ms. Jones.  (Id.) Ultimately, in February 2012, Mr. Colfield assisted Ms. Jones with EEOC charge after Mr. Bennett suspended Ms. Jones. (Id.)

Mr. Colfield was also approached for  assistance by co-worker; Rashida Daniels who showed Mr. Colfield a number of text messages from store manager Jimmy Bennett, pressuring her for sex.  (March 20, 15 Daniels Affidavit, hereinafter Ex.37) Mr. Colfield assisted Ms. Daniels with filing  an EEOC charge against Mr. Bennett and unwittingly sent the information to Safeway's attorney in June 2012.  (Ex.1 ¶26) This information was immediately forwarded to Ms. Graham by the attorney.  (Dkt. No. 88-10 ¶35) Shortly thereafter, Ms. Graham met with Ms. Daniels and told her to stay away from Mr. Colfield because he was trying to "use her for something he was trying to do".  (Ex.37 ¶¶7, 10) During this period, Mr. Colfield also assisted African American co-workers, Danny Carr and Anthony Wade with filing EEOC charges against Safeway for race discrimination. (Ex.1 ¶23)

### E.  Mr. Colfield's White Co-Workers Who Violated Safeway Work Rules and Policies   Were Give Favorable Treatment by Safeway

In November 2010, Ellicott City store manager, Mr. Kuntz observed food clerk/cashier Christine Haley checking out her sister, in violation of Safeway's Employee Store Purchase Policy.  (March 18, 2015 Robbins Affidavit, hereinafter Ex.38 ¶7) Mr. Kuntz whispered to Ms. Haley that she was not allowed to check out her sister.  (Id.) However, a week later, Ms. Haley again checked out her sister and Mr. Kuntz, who was aware, did nothing about it.  (Id.) (March 20, 2015 Easton Affidavit, hereinafter Ex.39) (April 18, 2015 Feeheley Affidavit, hereinafter Ex.40)

In April 2012, white bakery clerked Marsha Dichara, admittedly bumped an employee who was five months pregnant, and claimed it was an accident.  (May 2012 Dichara Work Place Violence ("WPV") Incident, hereinafter Ex.41) The action taken against Dichara was a review and sign off on Safeway's work place violence policy. (Id.) On or about September 4 2011, white employee Roger Bourn, a night crew employee, admittedly challenged another employee to a fight and called the employee a "pussy".  (September 19, 2011, Bourn WPV Incident, hereinafter Ex.42)  On September 16, 2011, Mr. Bourn was transferred to another store and received a final warning.  (Id.)

On or about August 13, 2012, a cashier reported that white employee Gary Hein; a cashier yelled and pointed his finger in the face of another cashier in the presence of customers. (October 18, 2012 Hein WPV, hereinafter Ex.43)  The employee reported that she felt very threatened by Mr. Hein.  (Id.) On August 18, 2012, Mr. Hein was transferred to another store. (Id.)

On or about November 22, 2011, white employee, Aaron LeKarz, intentionally pushed a shopping cart into an assistant store manager, Betsy Gavin.  (January 2012 Lekarz WPV Incident, hereinafter Ex.44) On January 11, 2011, Mr. LeKarz was issued a final warning and transfer to another store.  (Id.)

On or about March 21, 2011 a white night crew employee name Lydia Cole, struck another employee twice with a pallet. (May 9, 2011, Cole WPV, hereinafter Ex.45) Although Ms. Coles' actions were captured and reviewed on CCTV, on May 9, 2011, Ms. Cole was transferred to another store. (Id.)

On or about December 10, 2012 Glenn Carle, a white customer service employee, threatened a female employee, cursed in her face and invaded her personal space. (December 12, 2012, Carle WPV, hereinafter Ex.46) Mr. Carle received a verbal warning for his actions. (Id.)

White cashiers have repeatedly violated Safeway's employee purchase policies and mandatory policy against use of club card for customer. (Ex. 39, 40) In January 2011, Sean Ford made thirty (30) violation of the club card policy and was only given a warning. (January 18, 2011, Ford Club Card Violations, hereinafter, Ex.47) In October 20 11, Brittney Putresk made 15 violation of the club card policy in a week and was only given a warning. (November 2011, Petrusk Club Card Violation, hereinafter Ex. 48)  In February 2013, White cashier Salvati gave an customer an additional $100 cash causing a sales shortage.  No suspension or investigation was done.  (February 6, 2013 Salvati Conformation of Performance, hereinafter Ex.49)

### F.  Safeway's Had a Plan To Terminate Mr. Colfield With His Transfer to the Owings Mills Store

In late December 2011 Mr. Colfield learned that he was reinstated and would be transferred to Safeway's Owing Mills store, effective January 3, 2012.  (Ex.1 –Attachment A) Mr. Coiled immediately recalled information that in November 2011, an African American was transferred to Owings Mills as an Assistant store manager. (Id.) Mr. Colfield immediately suspected that Safeway transferred Mr. Colfield to Owings Mills to have an African American manager to use to fire him. Mr. Colfield reported his suspicion to the EEOC. (Id.)

In January 2012 Mr. Bennett told Maria Jones that Colfield was been transported to Owings Mills so Mr. Bennett could  fire Mr. Colfield, because Mr. Bennett "could get it done.". (Ex.36) During a March 2012 exchange with cashier Tony Mack, Mr. Bennett disclosed that Ms.

Graham told Mr. Bennett that he, "was receiving a transfer employee: who is a trouble maker and had a big mouth. He also will try to cause problems in your store." (Ex.22 – Attachment A)

After Bennett became the acting or relief manager, he told his assistant store managers, Mike Deinlein and Angela Corpew about a plan to fire Mr. Colfield and other African Americans.  (June 2012 Deinlein Statement, hereinafter Ex.50)   "The plan was to pick at every little thing that the employee would do that could be considered against policy. Really, it was more like picking on them. This would make them demonstrate anger and retaliation against management, which could be considered insubordination. Then we could take proper action and get them "out of there", said Jimmie. Personally, I witnessed firsthand, Jimmie instigate a yelling match between Maria and Stephen." (Id.)

After the April 25, 2012 argument between Mr. Colfield and Ms. Person, Mr. Deinlein reported that he was encouraged to falsely claim that Mr. Colfield pushed Mr. Deinlien. (Ex. 22) Ms. Person also reported to a number of employees that Mr. Colfield was not violent or threatening during the argument on April 25, 2015.  (Ex. 39, 40)

## III.    ARGUMENTS

**DEFENDANT MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE MATERIAL FACTS, AND THE REASONABLE INFERENCES THAT CAN BE DRAWN FROM THESE MATERIAL FACTS, ARE IN DISPUTE.  ADDITIONALLY, THE DEFENDANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

### A.    Motion for Summary Judgment Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed.R.Civ.P 56(c).  As the party moving for summary judgment, the Defendant has both an initial burden of production, and the ultimate burden of persuading the court that there is

"no genuine issue of material fact and that the moving party is entitled to summary judgment."

*Fed.R.Civ.Proc. 56(c)*.   When the moving party has met their initial burden of production, the

opposing party must only present evidence sufficient to create a genuine issue of material fact, i.e.,

that a "fair-minded jury could return a verdict for the [opposing party] on the evidence presented."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2502, 2512-13 (1986).   Inferences drawn

from the evidence must be viewed in the light most favorable to the nonmoving party.   Eastman

Kodak Co. v. Image Technical Services, Inc. 504 U.S. 451, 456, 112 S.Ct. 2072, 2077.   Credibility

determinations, weighing of evidence, and drawing of legitimate inferences from the facts are jury

functions, not those of a judge, whether his ruling is on motion for summary judgment or for

directed verdict; evidence of the nonmovant is to be believed and all justifiable inferences are to be

drawn in his favor.   *Id.*   In employment discrimination case, where employer's state of mind

necessarily is critical determination, court must find that it is "perfectly clear" that there are no

genuine issues of material fact before granting summary judgment.   Featherson v. Montgomery

County Public Schools, 739 F.Supp 1021 (D. Md. 1990).   Where the party challenging the grant of

summary judgment can show that the inferences they suggest are reasonable in light of the

competing inferences, summary judgment must be denied.   Columbia Union College v. Clarke, 159

F.3d 151 (D. Md. 1998).   Summary judgment is inappropriate even if merely inferences to be drawn

from facts are in dispute.   U.S. ex rel. Milam v. Regents of University of California, 912 F.Supp.

868 (D. Md. 1995).   Summary judgment is only appropriate when, after discovery, the non-moving

party has failed to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial.   Timothy R. Martin,

V. Scott & Stringfellow, Inc, *643 F. Supp. 2d 770*; (*2009*)

In this action Mr. Colfield allege that Safeway through its employees, agents and representative discriminated against Mr. Colfield in their disciplinary actions taken against Mr. Colfield in violation of Title VII and Section 1981. The allegations of violation of employee store purchase and work place violence policies were used as pretext to fire Mr. Colfield.  Here, "The motives and intent of Mr. Defendant in terminating Plaintiff form the central issues of Plaintiff's race discrimination and retaliation claims. Thus, because of the difficulties inherent in factual determinations of motivation and bias, such determinations are best left to the jury." *Reeves,* 530 U.S. at 150-151. The Fourth Circuit has noted that in evaluating a motion for summary judgment in employment discrimination cases, courts should be careful when considering such a remedy. "Summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense, (and) courts must take special care in cases such as the instant one because motive often is the critical issue in employment discrimination cases." Ballinger v. North Carolina Agric. Extension Senv., 815 F.2d 1001, 1004 (4th Cir. 1987).

**B.      Safeway is Not Entitled to Summary Judgment on Mr. Colfield Disparate Treatment Race Discrimination Claims for Disciplinary Actions.**

Material facts are in dispute regarding Plaintiff disparate treatment race discrimination claims for his suspension and termination.  Plaintiff has evidence to establish a prima facie case of discriminatory disciplinary actions against Plaintiff.  Furthermore, Mr. Colfield has evidence to show that the basis of the disciplinary actions were used as pretext to discriminate against Mr. Colfield due to his race and opposition to discriminatory treatment of African American employees by Safeway store managers.

19

Under the burden-shifting pretext framework, the employee must first establish a prima facie case of discrimination. To prove a prima facie case of racially motivated termination, plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. See, e.g., Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence that it terminated plaintiff's employment for a legitimate, nondiscriminatory reason. McDonnell Douglas, 411 U.S. at 802.

If defendant meets this burden, then plaintiff must prove, by a preponderance of the evidence, that defendant's articulated legitimate nondiscriminatory reason was a pretext to mask unlawful discrimination. Id. at 804; Hill, 354 F.3d at 285. Anglin v. Progress Energy Serv. Co., 645 F. Supp. 2d 519, 525, 2009 U.S. Dist. LEXIS 72709, *15-16 (E.D.N.C. 2009)

### 1. Plaintiff has Evidence of A Prima Facie Case of Discrimination Regarding his Employment Suspensions and Termination.

Where an employee complains that he was disciplined more harshly than other employees, in order to establish a *prima facie* case of discrimination, the employee must show: (1) that he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *Cook v. CSX Transportation Corp.,* 988 F.2d 507, 511 (4th Cir. 1993) (*citing Moore v. City of Charlotte,* 754 F.2d 1100, 1105-06 (4th Cir.), *cert. denied,* 472 U.S. 1021, 87 L. Ed. 2d 623, 105 S. Ct. 3489 (1985)).

### a. Mr. Colfield is An African American A Class of People Protected by Title and Section 1981.

There is no dispute that Mr. Colfield is an African American who is a class of people

protected against employment race discrimination under TitleVII and Section 1981.

### b. The prohibited conduct Alleged Against Mr. Colfield was comparable in seriousness to misconduct of White employees and the disciplinary measures enforced against Mr. Colfield were more severe than those enforced against the said   white employees.

#### i. Comparable Serious Violation of Safeway's Employee Purchase Policy, Mandatory Club Card Policies, Smoking Policies

Mr. Colfield was suspended three weeks for purchasing a DVD the evening before it was

release for sale. (Ex.1) Mr. Graham had to dredge up an employee purchase policy of which HR

manager Matthews remarked "no such policy available", to find a basis to justify the discipline

for the mistaken purchase.  (Ex.20) (Ex.21) Even the State employment unemployment division

found that the purchase was not misconduct in connection with Mr. Colfield's work. Safeway

suffered no loss or penalty from the sale. (Ex.19) The disciplinary measure enforced against Mr.

Colfield of three weeks suspension for the month of December 2011, without pay, plus a final

warning, were more severe than those enforced against white employees, including but not

limited to the following instances:

- In November 2010, white cashier Christine Haley check out her sister in violation of the store purchase policy. (Ex.38) (Ex.39) (Ex.40) This was observed by store manager Larry Kuntz, who whispered to Ms. Haley that she was violating Safeway policy. (Id.) However a week later, Ms. Haley repeated this action in the presence of Larry Kuntz. (Id.) The comparison with Plaintiff's violation is only in the name of the policy.  Ms. Haley's violation was brazen, repeated and compromising to Safeway. Not even a verbal warning was issued here.   Here the severity of Mr. Colfield's punishment in relation to Ms. Haley's is clear.

- Violation of Safeway Club Card Policy and employ purchase policy by white cashiers was a frequent occurrence at Safeway. (Ex.39) (Ex.40) The policy is mandatory. (Ex.17 at 54)  Violation of the policy result in the employee getting credit for customer purchases and Safeway losing opportunity for the customer to become a club card holder. In January 2011, Sean Ford made thirty (30) violation of the club card policy and was only given a warning. (Ex.47) In October 20 11, Brittney Putresk made 15 violation of the club card policy in a week and was only given a warning. (Ex.48) Here as well, the severity of Mr. Colfield's punishment compare verbal warnings for violations of the very serious and mandatory club card policy is clear.

In its motion for summary judgment, Safeway provided a list of White employees that Safeway claim were disciplined for work place violence, however no evidence that they are similarly situated as Plaintiff, In fact, although Safeway's counsel ably argue that they are similarly situation, not of the Affidavit indicates as such.

### ii.  Violation of Safeway's Work Place Violence Policy:

On April 25, 2012 Mr. Colfield was suspended indefinitely on allegations of workplace violence. (Ex.1) Nearly three months later, on July 16, 2012, Mr. Colfield was fired using the said allegations of work place violence as a pretext. (Ex.16)The disciplinary measure enforced against Mr. Colfield was more severe  than those enforced against similarly situated white employees, including in the following instances:

- On or about April 19 2012, white bakery clerked Marsha Dichara, admittedly bumped an employee who was five months pregnant, and hit her on her stomach.  (Ex.41) Dichara claimed it was an accident.  (Id.) The disciplinary action taken against Dichara was to have her reviewed and sign off on Safeway's work place violence policy on May 12, 2012.  (Id.) The disciplinary action resolved in three weeks. (Id.)

- On or about September 4 2011, white employee Roger Bourn, a night crew clerk, admittedly challenged another employee to a fight and called the employee a "pussy". (Ex.42)  The disciplinary action taken against Mr. Bourn was a transfer to another store and final warning on September 16, 2011. (Id.)   The disciplinary action resolved in eleven days. (Id.)

- On or about August 13, 2012, a cashier reported that white employee Gary Hein; a cashier yelled and pointed his finger in the face of another cashier in the presence of customer.   (Ex.43) The victim confirmed the report during the investigation and indicated that she felt very threatened by Mr. Hein.  (Id.) The disciplinary action taken

against Mr. Hein was a August 18, 2012, transferred to another store. The disciplinary action resolved in g days. (Id.)

- On or about November 22, 2011, white employee, Aaron LeKarz, intentionally pushed a shopping cart into an assistant store manager, Betsy Gavin.  (Ex.44) The disciplinary action taken against Mr. LeKarz, was a January 11, 2011, transfer to another store and a final warning.  (Id.) The disciplinary action resolved in seven weeks.   (Id.)

- On or about March 21, 2011 a white night crew employee name Lydia Cole, struck another employee twice with a pallet.   (Ex. 45) Although Ms. Coles' actions were captured and reviewed on CCTV, the action taken against Ms. Cole was a May 9, 2011 transferred to another store. (Id.) The disciplinary action resolved in nineteen days. (Id.)

On or about December 10, 2012 Glenn Carle, a white cashier/food clerk, threatened a female employee, cursed in her face and invaded her personal space.  (Ex.46) On December 12, 2012, Mr. Carle received a verbal warning for his actions. (Id.) The disciplinary action resolved in two days. (Id.)

The facts clearly show that Mr. Colfield's was treated more severely than his white counter parts under circumstances of similar seriousness.  All involve specific allegations of violence, threat, physical confrontation, that were alleged and confirmed or corroborated through investigations.  In some cases the offenders admit violence, including one case where Burn invited the employee to fight and call the employee a "pussy".  (Ex. 42) None of the perpetuator were suspended or terminated for their job for the allegations.  Furthermore, in all of these instance the time took to investigate and resolve the disciplinary was grossly more severe for Mr. Colfield.

Defendant numerous Affidavit evidence, with vague lists of "similarly situated" employees are not sufficient to overcome the dispute regarding material facts on this element. This is an issue for a Jury to decide.

### c. Mr. Colfield Work Performance Was Consistent with Legitimate Expectation of Safeway

Defendant argues that Plaintiff is required to established evidence that Plaintiff's job performance met the legitimate expectation of Safeway, as an essential element for his prima facie case.  (Dkt. No. 88-1 at 23) However *McDonald v. Santa Fe Trail Transp* (supra) makes clear that this is not required where Plaintiff's claim is based on disparate disciplinary actions, as is the case here.

Even if this element was required, this Circuit has held that: "while "[j]ob performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision,". . . "[w]hen the legitimate expectations of an employer are at issue on summary judgment, both the employer and employee may present evidence of the expectations themselves and their legitimacy." *Johnson*, 309 F. App'x at 683 n.8 (*citing Evans v. Tech. Applications & Serv. Co*., 80 F.3d 954, 960 (4th Cir. 1996) and *Warch*, 435 F.3d at 515-17). Odom v. Int'l Paper Co., 652 F. Supp. 2d 671, 684, 2009 U.S. Dist. LEXIS 83262, *31-32 (E.D. Va. 2009)

In this case, Plaintiff has evidence to establish a genuine issue of material fact as to whether Safeway's expectation was "legitimate" in the context of this case. The evidence supports proof that the December 12, 2011 DVD purchase and the April 25, 2012 the argument between Mr. Colfield and Ms. Persons were timely opportunities used as pretext to cover racial animosity which motivated the actions against Mr. Colfield.  There are genuine issues of material fact whether the decision makers truly and honestly believe Plaintiff's alleged violation of the employee store purchase and work place violence policies were the real reasons for the disciplinary actions against Mr. Colfield.

24

Furthermore, there is evidence in the record that Plaintiff was deliberately targeted, and there was a plot to set up the Plaintiff for termination. (Ex.1) (Ex.50) (Ex.22) The assistant store managers, who were briefed on the plan to fire Mr. Colfield, were the witnesses who provided information exaggerating and blaming Mr. Colfield for the incident.

As a factual matter, the last annual performance evaluation Mr. Colfield received in March 2011, showed that Mr. Colfield was performing satisfactorily. Some of evaluation comments about Mr. Colfield stated: "Stephen will work with other employee(s) to assist a customer when needed and he works well with his peers. Stephen comprehends and communicates very well when working with our customers and co-workers. Stephen is dependable; we can count on him coming to work and getting his assigned tasks completed." (Ex.3)

### 2. Safeway' Reasons for the Suspension and Termination Were Pretext For Impermissible Race Discrimination

To survive summary judgment, Taylor must rebut that evidence by showing that the proffered reason is, more likely than not, a pretext for discrimination. *See Holland*, 487 F.3d at 214-15 (*quoting Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) (internal quotations omitted)). A plaintiff can do this "by showing that the employer's proffered explanation is unworthy of credence." *Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotations omitted)). Taylor v. Rite Aid Corp., 993 F. Supp. 2d 551, 568, 2014 U.S. Dist. LEXIS 9754, *37, 21 Wage & Hour Cas. 2d (BNA) 1687, 29 Am. Disabilities Cas. (BNA) 897, 2014 WL 320214 (D. Md. 2014)

Plaintiff can offer proof of pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). Wang v. Metro. Life Ins. Co., 334 F. Supp. 2d 853, 869, 2004 U.S. Dist. LEXIS 18531, *44, 94 Fair Empl. Prac. Cas. (BNA) 1312 (D. Md. 2004)

In this case Mr. Colfield has evidence from which a reasonable jury could see that it is more likely than not Safeway fire Mr. Colfield because of his race and activities opposing racial discriminatory actions by store managers. Safeway's defense that the purchasing of a DVD and the incident with Ms. Person are the legitimate reasons for the actions against Mr. Colfield, is unworthy of credence, including for the following reasons:

- "Mr. Colfield was treated more severely for offenses that were as serious as those committed by white employers. "To be sure, evidence that an employer treated similarly situated individuals differently can be evidence of pretext." (See e.g., Laing v. Fed. Express Corp., 703 F.3d 713, 721 (4th Cir.2013) (stating that such comparator evidence "would be 'especially relevant' to a showing of pretext)". -

- White cashiers repeatedly violated the club card policies, gaining a benefit due to customer and loss to Safeway of potential club card members. Safeway's club card policy is of a more serious nature than the employee store purchase policy. "… employees are strictly prohibited from offering  for use or using their own person Club Card account or the Club Card account of any other Safeway employee to credit any other customer's transaction." (Ex.1 –Attachment H)

- Safeway's defends its actions by claiming that the decision maker was African American. Safeway attempt to minimize the participation of its' white HR manager and labor relations manager, as decision makers in the disciplinary action and that they  had the final say in the decision to suspend and fire Mr. Colfield.

- Assistant store manager Mike Deinlein disclosed a plot by Safeway to agitate Mr. Colfield and create insubordination against Colfield to fire him. Both Deinlein and Corpew were directed to implement such a plan against Mr. Colfield.  Both

26

Corpew and Deinlein were present at the meeting with between Colfield and Person and wrote statement exaggerating the incident and blaming Mr. Colfield.

- If Karen Graham is the decision maker, as Safeway claims, then she was acting improperly to "independently" investigate Mr. Colfield's discriminatory harassment complaint against Kuntz at the same time she was also strictly defending Safeway's actions against Mr. Colfield.  She was put in charge of defending Safeway against Plaintiff EEOC claim at the EEOC, while she supposedly conducted an unbiased investigation of Mr. Colfield's discriminatory harassment grievance.  This raises serious issues regarding her credibility when she claims that she was not influence by Mr. Colfield's EEOC claims.

- At the time Mr. Colfield was fired and or suspended, he was assisting his fellow assisting employees Maria Jones, Rashida Daniels, Anthony Wade, Mark Robins and others with complaints of discrimination against Safeway.  Safeway know about these activities and in the case of Ms. Daniels, who was been sexually harassed by the store manager, Ms. Graham disparages Mr. Colfield to Ms. Daniels, even though Mr. Colfield was assisting Ms. Daniels with legitimate claim.

### a. Same Race Decision Maker and Accuser Does not undermined Pretext in This Case

Safeway argues that Ms. Graham was the decision maker for the disciplinary actions taken against Mr. Colfield, and as such he cannot show pretext.  (Dkt. No. 88-1 at 28) As an initial matter, Ms. Graham's affidavit evidence is not sufficient to put the issue to rest, particularly here where evidence in the record shows that she was not the only decision maker and not the ultimate decision maker. (Ex.17 at 71-72) (Dkt. No. 88-10 ¶¶18, 30)  Instead her decision was coordinated with her white superiors, including Mr. Matthews, the HR manager, labor relations manager Madert and District Director Brian Caudle. (Ex. 20)  However, assuming arguendo that Ms. Graham was the decision maker, this raise a genuine issue of material fact as to the true reasons for the disciplinary actions.  She was the point person defending Safeway against Plaintiff's October 2011 EEOC charges as she investigated his grievance of discriminatory harassment against store manager Kuntz.  In June 2012, she was forwarded an

27

email from Mr. Colfield soliciting legal services with his EEOC charges and raising other discrimination claims and allegations by other employees who he was assisting with their claim. Mr. Colfield sent the email with documents attached, detailing his claims of discrimination by Safeway against African American employees.  There is also evidence that in January 2012 when Mr. Colfield was transferred to the Owings Mills store, Ms. Graham told Jimmy Bennett she was sending him a "loud mouth" and "trouble maker".  Furthermore, In July 2012, before Mr. Colfield was terminated, Graham told Ms. Daniels, who Mr. Colfield was assisting with a sexual harassment claims, "not to tell anyone about our meeting, she mentioned, "especially Mr. Colfield", or I could get fired. She stated that Mr. Colfield was trying or may try to use me to benefit himself in something he was trying to do." (Ex.37)

Furthermore, evidence in the record establishes proof that Ms. Graham punished Mr. Colfield more severe for violation of comparable seriousness as violation committed by Mr. Colfield's White co-worker.  In fact Plaintiff's white co-workers violation was of a more serious nature than Plaintiff's, yet Mr. Colfield was punished more severely. Furthermore, although Safeway claims that "Suspension is required in all disciplinary action in which loss prevention investigation" a number of Plaintiff's comparators were not suspended for similarly serious violations as alleged against Mr. Colfield.  (Dkt. No. 88-10 ¶16) This shows proof that Graham held Mr. Colfield to a higher standard of conduct than his white co-workers.  (See United States v. Crosby, 59 F.3d 1133, 1135 n.4 (11th Cir. 1995)(noting when decision-maker is same race as plaintiff, plaintiff should present evidence that such decision-maker held members of his or her own race to a higher standard of conduct than those of other races); Demesme v. Montgomery

Cnty. Gov't, 63 F.Supp.2d 678, 683 (D. Md. 1999) <u>Lidge v. Mohawk ESV, Inc</u>., 2014 U.S. Dist.

LEXIS 29147, *43 (D.S.C. Jan. 15, 2014)

      Even if Ms. Graham was the real decision maker, a jury should decide if, as the decision

maker she "honestly and truly believed" and had a real perception that the articulated reasons for

the disciplinary actions were influenced and motivated by her role and duty in protecting and

defending Safeway against Plaintiff's EEOC discrimination claim. Here Plaintiff is not seeking

determination as to whether the decision was fair, just, or wise; only to let a jury decide if Ms.

Graham truly and honestly believed the purchase of the DVD and the argument with Ms. Person

were the true basis for the disciplinary action or did discriminatory motives played a part in the

decisions for disciplinary actions against Mr. Colfield.

> ### 3.  Safeway Was Motivated by Mr. Colfield's Race and Colfield's Protest and Participation Activities Opposing Race Discrimination when Safeway Suspend and Terminated Mr. Colfield's Employment.

      There is direct evidence of Race discrimination having a direct bearing on the decisions

on disciplinary actions against Mr. Colfield.  There is evidence that Safeway use the race of Ms.

Graham and store manager Jimmy Bennett to undermine Mr. Colfield.

      "A plaintiff may defeat summary judgment and establish a race discrimination claim

under either the "mixed-motive" framework or the "burden-shifting" scheme set forth

in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807, 93 S. Ct. 1817, 36 L. Ed. 2d 668

(1973). In  a mixed-motive case,  a  plaintiff  must  sufficiently  plead,  through  direct  or

circumstantial evidence, that his race "was a motivating factor" in his employer's decision to

terminate him. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284-86 (4th Cir.

2004). Direct evidence is defined as "evidence of conduct or statements that both reflect directly

the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotations omitted). Under the mixed-motive framework, this Court has held that "a plaintiff faces a demanding standard when attempting to demonstrate direct evidence." Jordan v. Radiology Imaging Assocs., 577 F. Supp. 2d 771, 779 (D. Md. 2008). "To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait . . . actually motivated the employers' decision." *Hill*, 354 F.3d at 286. Hart v. Broadway Servs., 899 F. Supp. 2d 433, 441-442, 2012 U.S. Dist. LEXIS 138278, *19-20 (D. Md. 2012)

In this case, Safeway's decision to suspend and termination Plaintiff's employments was directly, indirectly and causally linked to Mr. Colfield's race and his opposition and participation against race discrimination. The clear evidence showing Mr. Colfield was punished more severely for violations of Safeway employee store purchase and work place violence policies, than his white counter parts that violated the same policies, is enough to establish direct bearing on the decision regarding disciplinary actions against Mr. Colfield.  Yet the evidence is more weighted.

When Colfield was been transferred, Graham told store manager Bennett that Colfield was a trouble maker, loud mouth and to watch him. (Ex. 22) Subsequently Bennett told the assistant store manager Deinlein and Corpew about a plan to agitate Colfield and entrap him to commit insubordination and then fire him. (Ex.50) At the time the only "trouble" Colfield was causing Safeway was his EEOC charge of discrimination and assisting other employees with complaints and grievances. Bennett also indicate that he could "get the job done" because he is

the same race as Mr. Colfield and this fact would undermine Mr. Colfield race discrimination case.  (Ex.36) (Ex.1 ¶21)

Moreover, it is more likely than not that Ms. Graham who claims to be the sole decision maker, did not truly and honestly believe the incidents were the real reasons for the disciplinary action decisions.   She was defending Safeway against Colfield's race discrimination EEOC charges and discrimination harassment grievance. (Ex.31) (Ex.32) Graham also received Colfield email to Safeway's seeking legal services, not knowing that the attorney was representing Safeway.   (Dkt. No. 88-10 ¶35)   The email disclosed detailed information regarding Mr. Colfield's EEOC allegations, witnesses, and about other African American who he was helping with claims of race discrimination.   To claim that all these adversarial activities undertaken by Ms. Graham to defend against Mr. Colfield's EEOC charge, did not bear on the disciplinary action decisions, is preposterous**.**  Clearly this issue is for a fair minded jury to decide.

### C.     Safeway Is not Entitled To Summary Judgment regarding Mr. Colfield's Claim for Disparate treatment Denial of Sunday Work Assignment

It is not disputed that between January 1, 2011 and August 2011 November Mr. Colfield was denied Sunday work schedule with double pay, allegedly because he was on light duty. Furthermore, Safeway has admitted that at least Tiffany Mertes was treated more favorably than Mr. Colfield, in that she also was on light duty status and was permitted to work on Sundays and get paid double time, unlike Mr. Colfield. However, Safeway Claim that Mr. Colfield cannot establish pretext because (Dkt. No. 88-1 at 34)

Plaintiff can offer proof of pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Tex. Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). <u>Wang v.</u>
<u>Metro. Life Ins. Co</u>., 334 F. Supp. 2d 853, 869, 2004 U.S. Dist. LEXIS 18531, *44, 94 Fair
Empl. Prac. Cas. (BNA) 1312 (D. Md. 2004)

 Here Plaintiff has sufficient admissible evidence from which a fair minded jury could
conclude that Safeway's reasons for denying Mr. Colfield's Sunday is not worthy of credence
and circumstantial evidence sufficiently probative of race discrimination.

 At least starting January 2011, Mr. Colfield complained to Ms. Graham that Mr. Kuntz
had decided that Mr. Colfield would no longer be allowed to work Sundays allegedly because of
Mr. Colfield's light duty status. (Ex.1 *¶12)* Mr. Colfield complained that Mr. Kuntz permitted
white food clerks/cashiers, Tiffani Mertes and Crystal Adams, who were also on light duty
status, to work Sundays. (Ex. 6 *¶5) (Ex.7)* Pursuant to the CBA between Safeway and Local 27,
 "[w]ork performed on Sunday will be compensated at double (2) the employee's rate of straight
time pay."  The CBA further states, "[i]n the Grocery Department Sunday and holiday work shall
be assigned on a rotating basis by seniority within classification and ability to do the work
considered.  *(Ex.8)*

  In response to Mr. Colfield's complaint of discriminatory denial of Sunday work
schedule, Safeway initially explained that: "[r]isk Management would not pay the overtime rate
for Colfield to work on Sundays", and "that if Mertes and Adams were scheduled to work
Sundays while on light duty, it was in error." *(Ex.9)* Safeway then changed reason stating that:
"Tiffany Mertes had seniority to Mr. Colfield, and therefore pursuant to the Union 27 Agreement
Ms. Mertes was always given preference over Mr. Colfield for light duty work on Sundays."
*(Ex.10) (Ex.11)* This position, been inconsistent with the CBA requiring rotating assignment

based on sonority, (Ex.8), Safeway again changed its explanation, now claiming that Mr. Colfield was denied Sunday working opportunities due to restrictions from his doctor. *(Dkt. No. 88-10 ¶6)*

"Employment discrimination plaintiff may establish pretext by proving that employer's explanation for employment decision is unworthy of credence or that employer's explanation is false; in appropriate circumstances, trier of fact can reasonably infer from falsity of explanation that employer is dissembling to cover up discriminatory purpose." Anderson v. Westinghouse Savannah River Co., 406 F. 3d 269 (S.C. 2005).

Safeway's searching, switching, and changing legitimate reasons why Safeway denied Mr. Colfield's Sunday work schedule is enough to show that the explanations are unworthy of credence and truthfulness.   In light of the previous false reasons, Safeway could not now seriously expect that this Court would accept favorably, Safeway's third reason, alleged medical restrictions, why Safeway denied Mr. Colfield Sunday work schedule with double time pay.

There is evidence that Mr. Colfield's race and Mr. Colfield claiming race as the reason why Mertes was given Sunday schedule while on light status. Furthermore, Mr. Graham deliberately avoided reviewing or investigating Mr. Colfield claim of Sunday work schedule denial, as a discrimination complaint, until after Mr. Colfield filed complaint of discrimination with the EEOC.  The deliberate act of avoiding employees legitimate discrimination complaint, to undermine "protected activities", clearly show that Safeway's state of mind was focus on Mr. Colfield's race as a protected class. (Ex.6 ¶5) *(Dkt. No. 88-10 ¶14)*

**D.     Defendant is Not Entitled to Summary Judgment on Mr. Colfield Retaliations Claims In Violation of Title VII and Section 1981.**

This circuit has held that <u>Nassar</u> did not alter the standard of proof for establishing a prima facie case for retaliation under McDonnell Douglas.[1] "The <u>McDonnell Douglas</u> framework is a three-step burden-shifting framework used by Title VII plaintiffs who lack direct evidence of retaliatory discrimination. <u>Diamond</u>, 416 F.3d at 318. To prevail under the <u>McDonnell Douglas</u> framework, Foster must first establish a prima facie case by showing: (i) "that [she] engaged in protected activity," (ii) "that [her employer] took adverse action against [her]," and (iii) "that a causal relationship existed between the protected activity and the adverse employment activity." <u>Price</u>, 380 F.3d at 212. The burden then shifts to the University to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. <u>Hill</u>, 354 F.3d at 285. If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons "were not its true reasons, but were a pretext for discrimination." <u>Id.</u> (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)); <u>see also Merritt v. Old Dominion Freight Line, Inc.</u>, 601 F.3d 289, 295 (4th Cir. 2010). In this way, a plaintiff is able to prove causation even without direct evidence of retaliatory

---

[1] Nassar's but-for causation standard is not the "heightened causation standard" described by the district court, J.A. 1166-67, and does not demand anything beyond what is already required by the McDonnell Douglas "real reason" standard. A plaintiff who can show that retaliation "was the real reason for the [adverse employment action],"Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007), will necessarily be able "to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct," Nassar, 133 S. Ct. at 2525(internal quotation marks and citation omitted). In other words, the statements "the real reason for Foster's termination was her employer's retaliation" and "Foster would not have been terminated but for her employer's retaliatory animus" are functionally equivalent. We conclude, therefore, that the McDonnell Douglas framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action. Nassar does not alter the legal standard for adjudicating a McDonnell Douglas retaliation claim. Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 252, 2015 U.S. App. LEXIS 8384, *18, 127 Fair Empl. Prac. Cas. (BNA) 167, 99 Empl. Prac. Dec. (CCH) P45,319 (4th Cir. Md. 2015)

animus: If a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination. <u>Reeves</u>, 530 U.S. at 148 ( "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). <u>Foster v. Univ. of Maryland-Eastern Shore</u>, 787 F.3d 243, 250, 2015 U.S. App. LEXIS 8384, *12-13, 127 Fair Empl. Prac. Cas. (BNA) 167, 99 Empl. Prac. Dec. (CCH) P45,319 (4th Cir. Md. 2015)

### 1. Plaintiff Has Evidence to Establish A Prima Facie Case of Retaliation in Violation of Title VII and Section 1981

Evidence in the records establishes that Plaintiff suffered discriminatory retaliation due to his opposition to discrimination and his participation in protected activities of complaining about discrimination against store manager Larry Kuntz and filing EEOC discrimination claims for Safeway actions against Plaintiff and other African American employees.

#### a. Mr. Colfield Engaged In Protected Activities

The records in this case shows that in January 2011 Mr. Colfield complaint about discrimination in the denial of Sunday work schedule by Mr. Kuntz. (Ex.7) In August 2011 Mr. Colfield complained of discriminatory harassment against Mr. Kuntz. (Ex.1 ¶13) On or about October 27, 2011, Mr. Colfield filed a grievance of discriminatory harassment by Kuntz. (Dkt. No. 88-10 ¶10) This was received by Ms. Madert who forwards it to Ms. Graham on November 1, 2011, for investigation. (Ex.12) On October 15, 2012 Plaintiff file EEOC Charges, which were sent to Ms. Graham on October 25, 2012. (Ex.7) (Ex.30) On July 13, 2012, Mr. Colfield filed a new charge of discrimination regarding his suspension. (Ex.35)

35

All of Mr. Colfield's protected activities were well known to Safeway, particularly after the October 2011 grievance against Mr. Kuntz for discriminatory harassment. Furthermore, in June 2011, during the EEOC investigation of Plaintiff's EEOC charge, Mr. Colfield unwittingly send an email to Safeway's attorney soliciting legal services with his EEOC claims. The documents disclosed detailed and specific information about Mr. Colfield's EEOC claims, rebuttal, witnesses, suffering and lack of resources due to the suspension, and specific information about other African Americans who were claiming employment discrimination and who were been help by Mr. Colfield. Unfortunately Mr. Colfield's email was forwarded to Ms. Graham without Mr. Colfield's knowledge and Safeway used the information in its decision to fire Mr. Colfield.

### b. Mr. Colfield Suffered Adverse Employment Actions by Safeway

It is not disputed that the denial of Sunday work schedule at double time pay was adverse action. Furthermore, the December 2011 three week suspension for alleged violation of Safeway employee store purchase policy and Plaintiff's April 25, 2012 suspension and termination on July 16 2012, for alleged violation of Safeway's work place violence policy, were adverse actions.

### c. Casual Connection Exist Between the Protected Activities and the Adverse Action

Safeway argues that Plaintiff cannot establish casual connection to his protected activities and the adverse disciplinary actions taken against Mr. Colfield because the time between the events is more than one month and intervening events justified Safeway's actions. (Dkt. No. 88-1 at 44-45) Safeway's arguments here are without merit.

"Courts have established the general parameters of temporal proximity for purposes of REDA on a case-by-case basis. At one extreme, courts have found a time period of approximately one month or less to constitute close temporal proximity." Smith, 568 F. Supp. 2d at 614 (citations omitted). Under these circumstances, close temporal proximity may be sufficient alone to establish the requisite "causal connection element of the prima facie case under REDA". Id. at 614 n. 12 (citations omitted). "At the other extreme, courts have held a time period of more than two and one-half months to constitute the absence of close temporal proximity." Id. at 614 (citations omitted). Nguyen v. Austin Quality Foods, Inc., 974 F. Supp. 2d 879, 883, 2013 U.S. Dist. LEXIS 136726, *8-9, 2013 WL 5356880 (E.D.N.C. 2013)

In this case, the temporal proximity between Mr. Colfield protected activity of filing a EEOC claim on October 15, 2011 and his December 13, 2011 suspension is  approximately 2 months, establishing temporal proximity.  This alone is sufficient to establish casual connection with Plaintiff's December 13, 2011 suspension.

The temporal proximity between Plaintiff October 2011 EEOC protected activity and his April 2012 suspension and July 2012 termination for alleged work place violence, is six months, and nine months, respectively, generally indicating an absence of temporal proximity.  However, "When the time period between the protected activity and adverse employment action is greater than two and one-half months, courts have considered temporal proximity in addition to direct and circumstantial evidence of causation. See Edwards, 812 F. Supp. 2d at 695. "A grey area appears to exist for periods between one month and two and one-half months." Smith, 568 F. Supp. 2d at 615. Nguyen v. Austin Quality Foods, Inc., 974 F. Supp. 2d 879, 883, 2013 U.S. Dist. LEXIS 136726, *8-9, 2013 WL 5356880 (E.D.N.C. 2013)

"Moreover, while causation relies heavily on certain facts and circumstances of a case, "temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employers," are pertinent factors to the causation element. *Jaudon v. Elder Health, Inc.*, 125 F.Supp.2d 153, 165 (D. Md. 2000) (decided at the summary judgment stage thus applying a different legal standard than Rule 12(b)(6)); *see also Williams*, 871 F.2d at 457 (recognizing temporal proximity as important factor). Moser v. Driller's Serv., 988 F. Supp. 2d 559, 566, 2013 U.S. Dist. LEXIS 150827, *18, 2013 WL 5707365 (W.D.N.C. 2013)

### i.   Intervening Pattern of Retaliatory Conduct Exist

The temporal proximity between Plaintiff October 2011 EEOC protected activity and his April 2012 suspension and July 2012 termination for alleged work place violence, is six months, and nine months, repetitively.  During this time, on December 13, 2011 Plaintiff was suspended for three weeks and on April 25, 2012 indefinitely suspended until he was terminated on July 16, 2015. Furthermore there is evidence probative of race, because Mr. Colfield was more severely punished than is white co-workers for violation of a Safeway policy that was similar in seriousness.  Mr. Colfield was held to a higher standard than his white counter parts with the severity of disciplinary action taken against him.  Furthermore there is evidence that Mr. Colfield was targeted for termination and that Safeway did not fairly and honestly investigate Mr. Colfield's complaints and grievance for race discrimination and harassment regarding he denial of Sunday work schedule, and discriminatory harassment.

### 2. Safeway's Reasons for the Suspensions and Termination Were Pretext For Retaliation

Plaintiff can offer proof of pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). <u>Wang v. Metro. Life Ins. Co</u>., 334 F. Supp. 2d 853, 869, 2004 U.S. Dist. LEXIS 18531, *44, 94 Fair Empl. Prac. Cas. (BNA) 1312 (D. Md. 2004)

In this case there is clear evidence of that the explanation is unworthy of credence and there is circumstantial evidence probative of retaliation. Mr. Colfield was treated more severely than his white counterparts, for similarly serious offenses. Ms. Graham, the claimed decision makers, as HR Advisor, conducted "fair" or "independent" investigation, found no discrimination, while at the same time representing and defendant Safeway against Mr. Colfield's EEOC claims.

There is evidence that Safeway management had a plan to agitate Mr. Colfield and get him to commit insubordination in order to fire him. How ironic it is that both assistant store manager Deinlein and Corpew, who Deinlein claimed were directed to target and agitate Mr. Colfield and create insubordination against him to fire him, were given such a convenient incident of the argument between Mr. Colfield and Ms. Person, to use as a cover to legitimize the termination plan. This happened the day after Mr. Colfield attended a fact finding meeting at the EEOC regarding his EEOC charge against Safeway.

Plaintiff further incorporates by reference his arguments for pretext in his disparate treatment disciplinary action claim, set forth above, as the same principles on which Plaintiff also establishes pretext for his retaliation.

> ### 3. Mr. Colfield's Race And His Protest and Participation Against Race Discrimination At Safeway Was the Real and Actual Motivation for the Discriminatory Retaliation with Disciplinary Actions Against Mr. Colfield.

Even in a mixed motive case, however, a plaintiff must establish that national origin was a motivating factor in the decision to terminate employment. Hill, 354 F.3d at 284. Evidence must not only reflect a discriminatory attitude, but must also bear directly on the contested employment decision. Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). Bibichev v. Triad Int'l Maint. Corp., 951 F. Supp. 2d 839, 850, 2013 U.S. Dist. LEXIS 83849, *30, 2013 WL 2947084 (M.D.N.C. 2013)[2]

In this case, Safeway's decision to suspend and termination Plaintiff's employments bear directly, indirectly and causally to Mr. Colfield's race and his opposition and participation against race discrimination at the job. The clear evidence showing Mr. Colfield was punished more severely for violations of Safeway employee store purchase and work place violence policies, than his white counter parts who violated the same policies, is enough to establish direct

---

[2] Nassar does not require that protected activity be the only factor that resulted in an adverse action, just that the adverse action would not have occurred without the protected activity. See Nassar, 133 S. Ct. at 2533 ("Title VII requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Accordingly, Taylor's performance problems alone, even if they motivated the decision to terminate her in part, do not foreclose a retaliation claim under Nassar. Taylor v. Rite Aid Corp., 993 F. Supp. 2d 551, 567, 2014 U.S. Dist. LEXIS 9754, *34, 21 Wage & Hour Cas. 2d (BNA) 1687, 29 Am. Disabilities Cas. (BNA) 897, 2014 WL 320214 (D. Md. 2014)

bearing on the decision regarding disciplinary actions against Mr. Colfield.  Yet the evidence is more weighted.

When Colfield was been transferred, Graham told store manager Bennett that Colfield was a trouble maker, loud mouth and to watch him.  Subsequently Bennett told the assistant store manager Deinlein and Corpew about a plan to agitate Colfield and entrap him to commit insubordination and then fire him.  At the time the only "trouble" Colfield was causing Safeway was his EEOC charge of discrimination and assisting other employees with complaints and grievances. Bennett also indicate that he could "get the job done" because he is  the same race as Mr. Colfield and this fact would undermine Mr. Colfield race discrimination case.

Moreover, it is more likely than not that Ms. Graham who claims to be the sole decision maker, did not truly and honestly believe the incidents were the real reasons for the disciplinary action decisions.   She was defended Safeway against Colfield's race discrimination EEOC charges and discrimination harassment grievance.

Plaintiff further incorporates by reference his arguments for direct evidence of race in his disparate treatment disciplinary action claim, set forth above, as the same principles on which Plaintiff also establishes direct evidence of retaliation.

## IV. CONCLUSION

For the forgoing reasons, the Court should deny Safeway's Motion for Summary Judgment. For, "when the moving party has met their initial burden of production, the opposing party must only present evidence sufficient to create a genuine issue of material fact, i.e., that a "fair-minded jury could return a verdict for the [opposing party] on the evidence presented."  In this case Mr. Colfield has met his burden to production setting forth evidence establishing a

prima facie case for disparate treatment disciplinary action, denial of double time pay schedule, and retaliation.  Furthermore, Mr. Colfield his put forth evidence sufficient to persuade a fair-minded jury by a preponderance, that Mr. Colfield's race as an African American and his participation and opposition to what he reasonably believed to be racially motivated discriminatory employment action against African American, could be the actual reason for Safeway denying Mr. Colfield Sunday work schedules, for his severe and long suspension and for his termination.

Respectfully Submitted,

*/s/ George A. Rose*

_____
George A. Rose, Esq.
Federal Bar No. 26086

Rose Law Firm, LLC
200 E. Lexington St. Suite 800
Baltimore, MD.  21202
Ph.410-727-7555
Fax.  443-320-0962
Email: grose@roselawfirm.net

Attorney for Stephen Colfield