IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


STEPHEN COLFIELD          *
                          *
v.                        *     Civil Action No. WMN-12-3544
                          *
SAFEWAY INC.              *


   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM

     Before the Court is a Motion for Summary Judgment filed by

Defendant Safeway Inc.  ECF No. 88.  That motion is fully

briefed.  Also pending is Defendant's Motion to Strike several

of the exhibits attached to Plaintiff's Opposition to

Defendant's Summary Judgment Motion.  ECF No. 107.  That motion

is also ripe.  Upon review of the motions and the applicable

case law, the Court determines that no hearing is necessary,

Local Rule 105.6, and that both motions will be granted in part

and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

     Plaintiff was employed by Defendant as a food or produce

clerk from January 2004 until his employment was terminated on

or about July 16, 2012.  Plaintiff is African American and

brings this suit alleging that he was discriminated against on

the basis of his race and that he was retaliated against when he

complained about various discriminatory practices to which he

and other employees were subjected.  His claims focus on four

specific actions or categories of actions taken against him by Defendant.

The first relates to Defendant's refusal to assign him any Sunday hours while he was on light duty status from September 2010 to August 2011.  Plaintiff suffered an on-the-job injury in March of 2010 and was on injured workers' compensation leave from June 2010 to September 2010.  When he returned to work, he requested and was granted light duty status.  During this time, he was assigned to Defendant's Ellicott City store under Store Manager Larry Kunze,[1] a Caucasian.  He contends that Kunze permitted two white employees who were also on light duty status to work Sundays but would not permit him to do so despite his repeated requests for Sunday hours.  Plaintiff desired Sunday work because it is compensated at twice that of regular time pay.

The second category of actions taken by Defendant that Plaintiff believes was discriminatory or retaliatory was his assignment to undesirable tasks, like cleaning up dead mice or filthy trash, and his being subjected to disproportional discipline for minor work rule violations.  Plaintiff asserts that this was the first time in his twenty years of experience as a food or produce clerk that he was given these types of

---

[1] Throughout his pleadings, Plaintiff refers to this individual as "Kuntz."  This individual signed his affidavit as Kunze and the Court will use that surname throughout.

undesirable tasks to perform.  As an example of disproportional discipline, Plaintiff cites incidents where he was written up for failing to hit a particular button on the cash register which, after scanning the customer's Club Card, would indicate whether that customer was an "elite customer."  This requirement was part of Defendant's "Rapport Program," which was designed to "promote sincere dialogue between Safeway customers and employees."  Kunze Aff. ¶ 10, ECF No. 88-11.  Plaintiff cites instances where other employees committed more serious work rule violations and did not receive any discipline.  For example, while Defendant's Employee Store Purchase Policy prohibits employees from ringing up the purchases of family members, a Caucasian cashier, Christine Haley, checked out her sister on more than one occasion and Kunze took no disciplinary action. Mark Robins Aff. ¶ 7, ECF No. 98-38 and Leslie Easton Aff. ¶ 11, ECF No. 98-39.[2]

The third action taken against Plaintiff that he views as discriminatory and retaliatory was his suspension on December 13, 2011, for his purchase of a "Planet of the Apes" DVD one day before it was due to be released for sale to the public. Plaintiff picked up the DVD from the receiving room of the store and, not knowing it was not supposed to be sold until the next

---

[2] These affidavits are the subject of Defendant's Motion to Strike but, as explained below, the Motion to Strike will be denied as to this portion of these documents.

day, took it to the self-checkout.  When he experienced some
difficulty at the self-checkout register unrelated to the pre-
release status of the DVD, he was assisted by the self-checkout
cashier, Tiffany Mertes, and made the purchase.  Mertes
Statement, ECF No. 98-15.  The next day, Mertes, who is
Caucasian, reported the sale to Kunze and Plaintiff was
immediately suspended.

Although Defendant acknowledges that it suffered no
negative repercussions for this pre-release sale, ECF No. 98-16,
it maintains that the purchase violated the following Employee
Purchase Policy:  "All employees, their friends and family members
shall be treated as other customers.  At no time are they to be
extended preferential treatment."  Karen Graham Aff., Exhibit E,
ECF No. 88-10 at 28.  For this violation, Plaintiff was suspended
for three weeks, without pay.  At the conclusion of the suspension,
Plaintiff was transferred to Defendant's Owings Mills store,
effective January 1, 2012.

The fourth and final adverse action taken by Defendant against
Plaintiff was his suspension and the termination of his employment
following an alleged incident of work place violence that occurred
on April 25, 2012.  On that date, Plaintiff went to the management
office of his store and spoke with two assistant store managers,
Angela Corprew and Charles "Mike" Deinlein.  Having heard that a
co-worker, Tia Person, was about to lodge a complaint against him

4

with Defendant's Human Resources Department, Plaintiff requested that Corprew call Person into the office, which she did.  Tia Person is African American and Corprew is of mixed race.  According to Plaintiff, soon after he and Person began their discussion, both became agitated and Person became confrontational.  As the situation escalated, Plaintiff tried to leave the office but Person blocked his path causing him to bump shoulders with her as he left the office.  Plaintiff was immediately suspended pending investigation and an investigation was conducted by Allen Tlusty, a Loss Prevention Investigator for Defendant.  Plaintiff's employment was ultimately terminated on or about July 16, 2012, based upon this alleged violation of Defendant's zero-tolerance Workplace Violence Policy.

As support for his claim that these actions were taken against him in retaliation for his opposition to Defendant's discriminatory practices, Plaintiff recites a history of his advocating for himself and others.  In January of 2011, Plaintiff complained to Human Resources Representative Karen Graham that, while Kunze would not schedule him for Sunday shifts while on light duty status, he was giving Sunday work to two white employees who were also on light duty status, Tiffany Mertes and Crystal Adams.  Karen Graham is African American.  On or about September 28, 2011, Plaintiff met with Graham and again complained about Kunze's refusal to schedule him for Sundays, assigning him undesirable tasks, and severely restricting his interactions with co-workers.  Plaintiff also

mentioned Kunze's discriminatory harassment of a Jewish coworker, Mark Robins.  While Plaintiff maintains that he presented these complaints as complaints of discriminatory harassment, Graham did not investigate those allegations.  He also asserts that Kunze issued him a disciplinary write up the very next day, September 29, 2011.  Pl.'s Aff. ¶ 14, ECF No. 98-1.

On or about October 15, 2011, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) asserting that he believed he was being discriminated against on the basis of his race and retaliation.  EEOC Charge, ECF No. 88-30.  On or about October 27, 2011, Plaintiff filed a grievance for racial harassment against Kunze with his union, United Food and Commercial Workers Union, Local 27 (Local 27).  Plaintiff met with Graham on or about November 22, 2011, to discuss his grievance.  Graham states that, while she understood that Plaintiff was asserting that Kunze was biased against him, she did not understand that the bias was racially based.  Graham Aff. ¶ 7, ECF No. 88-10.  The Court notes, however, that the EEOC had sent a Notice of Charge of Discrimination to Graham on October 25, 2011, and that Notice clearly indicated that Plaintiff was asserting a claim of discrimination based on race as well as retaliation.  ECF No. 98-30.

On April 4, 2012, Plaintiff sent a letter to the EEOC updating his charge regarding his transfer to the Owings Mill store and his belief that he was moved to this store so that the black co-manager

of that store, Jimmy Bennett, could fire him and, because Bennett was black, Plaintiff would not be able to argue that his firing was racially based.  Pl.'s Aff., Ex. A, ECF No. 98-1 at 7-9.  On April 24, 2012, Plaintiff had a fact finding meeting at the EEOC concerning his EEOC charge which Graham and several store managers attended.  It was the very next day that the confrontation with Person that led to his termination occurred.

In addition to filing charges and grievances on his own behalf, Plaintiff also assisted other employees with charges and grievances against Defendant.  From 2006 to 2010, while Plaintiff was assigned to Defendant's Pikesville Store, Plaintiff served as the shop steward for Local 27.  Although he did not maintain that role once transferred from that store, other employees still sought his advice and assistance.  For example, he assisted Maria Jones, an African American produce clerk, with an EEOC charge after she was suspended by Jimmy Bennett.  He also assisted African American co-workers Danny Carr and Anthony Wade with their filing of EEOC charges of racial discrimination although it is not clear that Defendant was aware that Plaintiff was providing this assistance.

In the period immediately leading up to the termination of his employment, Plaintiff was also assisting co-worker Rashida Daniels-Gordon[3] with filing an EEOC charge for sexual harassment after store

---

[3] Plaintiff refers to this co-worker as "Rashida Daniels."  The Court will use the name by which she signed her affidavit.  ECF No. 98-37.

manager, Jimmy Bennett, sent her text messages pressuring her for sex.  In the process of providing that assistance, Plaintiff inadvertently sent copies of the text messages to Defendant's attorney, who forwarded the information to Graham.[4]  Graham then requested that Daniels-Gordon meet with her at a secret location away from the store.  Graham met with Daniels-Gordon at a nearby sandwich shop and, while Graham told Daniels-Gordon that the purpose of the meeting was to investigate her sexual harassment complaint, Daniels-Gordon stated that Graham focused her questions more on Plaintiff - how he knew about her complaint and if he was helping with that complaint.  Rashida Daniels-Gordon Aff. ¶¶ 6,7, ECF No. 98-37.  Graham ended the meeting by warning Daniels-Gordon not to tell anyone about the meeting, especially Plaintiff.  Id. ¶ 10.

Based upon this series of events, Plaintiff brought claims in his Amended Complaint under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. (Title VII), the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 (§ 1981), and 42 U.S.C. § 1985(3) (§ 1985(3)).  The § 1985(3) claim was asserted against Plaintiff's union, Local 27, as well as

---

[4] Plaintiff was attempting to find legal representation for himself and came across Defendant's attorneys listed on a referral website as a firm that does employment law.  He then emailed the details of his claims to the firm and included copies of the text messages from Bennett in that submission. ECF No. 73-3.  This inadvertent disclosure was the subject of Plaintiff's motion to disqualify Defendant's counsel, ECF No. 73, which this Court denied.  ECF No. 85.

Defendant Safeway.  On November 18, 2014, this Court dismissed the § 1985(3) claim and dismissed Local 27 as a defendant. Thus, what remains are Plaintiff's race discrimination and retaliation claims under Title VII (Counts One and Two, respectively) and his race discrimination claim under § 1981 (Count Four).

Defendant has moved for summary judgment as to all of those remaining claims.  ECF No. 88.  Plaintiff opposed the motion, ECF No. 98, and Defendant then filed a motion to strike a variety of documents (or at least portions of documents) that were submitted by Plaintiff in support of his opposition.  ECF No. 107.  Because resolution of the motion to strike will determine the evidence that can be considered in resolving the motion for summary judgment, the Court turns first to the motion to strike.

## II. MOTION TO STRIKE

Defendant challenges the documents submitted by Plaintiff on a variety of grounds.  Some are challenged because the documents purportedly were not produced or the affiant was not identified as a witness during discovery.  Others are challenged because the document is unsworn.  Portions of some documents are challenged because the testimony is not based on personal knowledge, is based on hearsay, or goes beyond the scope of knowledge of the affiant disclosed in discovery.  Portions of

Plaintiff's affidavit are challenged on the ground that they are allegedly inconsistent with Plaintiff's deposition testimony.

Defendant's motion to strike is governed by several provisions of the Federal Rules of Civil Procedure. Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 26(e)(1) provides that, when a party has responded to interrogatories, requests for production, or requests for admissions and later learns that its disclosure or response is incomplete or incorrect in some material respect, the party must supplement its previous disclosure or response. Rule 56(c)(4) requires that "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated." Thus, under this Rule, statements in an affidavit or declaration cannot be conclusory or based upon hearsay. Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). In addition, where a party has been deposed, courts do not permit that party to avoid summary judgment by submitting an

affidavit that contradicts the prior sworn deposition testimony. <u>Barwick v. Celotex Corp.</u>, 736 F.2d 946, 975 (4th Cir. 1984).

When applying these rules to a motion to strike, however, courts use "a scalpel, not a butcher knife," to strike only those portions of an affidavit that do not satisfy the requirements of Rule 56(c). <u>Upshaw v. Ford Motor Co.</u>, 576 F.3d 576, 593 (6th Cir. 2009). In addition, "the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party," <u>Blasic v. Chugach Support Servs., Inc.</u>, 673 F. Supp. 2d 389, 396 (D. Md. 2009), and "doubts regarding admissibility are resolved in favor of the party opposing summary judgment." <u>United States v. Bell</u>, 27 F. Supp. 2d 1191, 1194 (E.D. Cal. 1998).

With these principles in mind, the Court turns to the evidence challenged by Defendant.

### A. Affidavit of Leslie Easton (ECF No. 98-39)

In its motion to strike, Defendant contended that Leslie Easton was never disclosed as a potential witness during discovery and that Plaintiff failed to provide her affidavit during discovery even though it was signed on March 20, 2015, more than two months prior to the close of discovery on May 27, 2015. Defendant also contends that Easton's statements are not based on personal knowledge. In his Opposition, Plaintiff correctly notes that the Easton Affidavit was produced to

Defendant as part of a supplemental production on April 6, 2015, shortly after it was signed and more than a month and a half before the close of discovery.  Defendant concedes in its Reply that it did indeed receive this affidavit during discovery.

As to the content of the affidavit, Easton signed the affidavit under the following affirmation:

> I solemnly affirm under the penalties of perjury that all the information contained in this Affidavit is based on personal knowledge, except as to those things stated upon information and belief and as to those things; I believe them to be true.

Seizing on the last part of that affirmation, Defendant suggests that, at the least, paragraph 9, in which she stated she "believed that she was targeted for punishment and discipline" because the father of her child was African American should be stricken.  ECF No. 98-39 ¶ 9.  Except for her statement that she actually "observed" Defendant's managers targeting African American employees for punishment and discipline while giving white employees more favorable treatment, id. ¶ 8, the remainder of her statements are challenged on the ground that she does not state the way in which she came to have personal knowledge of the facts to which she attests.

While paragraph 9 certainly must be stricken, the remainder of the statements in her affidavit will not be.  Easton affirmatively declares that she has personal knowledge of the events she describes and they are all events that she readily

12

could have observed in the store in which she worked.  For
example, in addition to the incidents in paragraph 8 that she
expressly states she observed, she describes in paragraph 10 one
specific occasion when a customer complained about a Caucasian
employee and Kunze took no action and another when a customer
complained about an African American employee and that employee
was reprimanded.  She states that a Caucasian employee, Tiffany
Mertes, was assigned Sunday shifts while on light duty where
Plaintiff was not.  These are all events that Easton could have
seen while working in the store in which they took place.

     In moving to strike most if not all of Easton's affidavit,
Defendant seems to suggest that, to be admissible, every
statement in the affidavit must be preceded by the phrase that
she "personally observed" the event in question.  ECF No. 112 at
7.  At this stage in the litigation, the Court finds sufficient
Plaintiff's affirmation that all of the information in the
affidavit (except paragraph 9) was based on personal knowledge.
While Defendant certainly could have further explored the basis
of her knowledge in a deposition, Defendant elected not to do
so.[5]

---

[5] A portion of one statement in Easton's affidavit – that Kunze
"knew" of instances where a white employee, Christine Haley,
violated a store policy by ringing up her sister's purchases and
took no action – comes the closest to falling outside of the
scope of her personal knowledge.  Unless she saw Kunze watching

The motion to strike the Easton Affidavit will be granted only as to paragraph 9.[6]

## B. Affidavit of Rashida Daniels-Gordon (ECF No. 98-37)

In her Affidavit, Rashida Daniels-Gordon recounted the details of her secret meeting with Graham, discussed above. Like the Easton Affidavit, Defendant moves to strike the affidavit of Daniels-Gordon on the ground that she was never identified during discovery as a person with knowledge.  Also like the Easton Affidavit, Defendant was incorrect about the Daniels-Gordon Affidavit in that it was produced to Defendant on March 23, 2015, two months prior to the close of discovery, as an attachment to Plaintiff's motion to disqualify counsel.  ECF No. 73-4.  Again, like Easton, Defendant decided not to depose Daniels-Gordon.  The Court will deny the motion to strike as to the Daniels-Gordon Affidavit.

## C. Affidavit of Patrick Feeheley (ECF No. 98-40)

While Defendant acknowledges the Patrick Feeheley was identified during discovery as a potential witness, his affidavit was not produced during discovery despite being signed on April 18, 2015, well before the end of the discovery period.

---

the transactions, which she certainly could have, she would not have personal knowledge of his knowledge.

[6] While the Court will not strike the remaining portions of Easton's affidavit on the grounds raised by Defendant, those statements are so generalized and conclusory so as to carry little weight.

14

Defendant also complains that Feeheley's knowledge as reflected in his affidavit goes beyond that reflected in Plaintiff's answers to interrogatories.  Plaintiff's answers to interrogatories indicated that Feeheley had knowledge of Plaintiff's general character, the impact Plaintiff's firing had on Plaintiff's personal and family life, as well as Plaintiff's union activities and discrimination complaints and grievances he pursued on behalf of himself and others.  Ans. to Interrogs., ECF No. 107-3 at 2, 7.  His affidavit, however, is silent on those topics but instead lists seven specific instances where Caucasian employees were treated more favorably than African American employees.  ECF No. 98-40 at ¶ 3.

As noted above, Rule 37(c)(1) provides that, where a party fails to provide evidence during discovery, it cannot use that evidence to defeat a summary judgment motion "unless the failure was substantially justified or is harmless."  In opposing the motion to strike, Plaintiff makes no response to Defendant's arguments concerning the Feeheley Affidavit.  Thus, Plaintiff has offered no justification for his failure to produce this evidence earlier and it is certainly not harmless information. The Court will grant Defendant's motion to strike as to this affidavit.

**D. Affidavit of Tony Mack and Attached Statements (ECF No. 98-22)**

Tony Mack is an employee of Defendant who worked with Plaintiff throughout Plaintiff's employment with Defendant.  In his affidavit, Mack included the following representations:

(1) that Jimmy Bennett told him that he was sent to the Owings Mills store in part to fire Plaintiff so that Plaintiff could not claim discrimination and that he knew about Plaintiff's EEOC charge and that Plaintiff was labeled a "troublemaker", ECF No. 98-22 ¶ 3;

(2) that Deinlein told him that Plaintiff was a "problem" employee and that there was a plot to fire him involving calling him out for minor policy infractions until he became angry and did something that could be considered insubordination, id. ¶ 4;

(3) that Deinlein told him that, when Tlusty interviewed him concerning the April 25, 2012,[7] incident, he "prodded and forced" Deinlein to claim that Plaintiff pushed Deinlein and to blame Plaintiff for the incident even though Person was the instigator, id. ¶ 5;

(4) that after the April 25, 2015, incident, Person told a number of other employees that Plaintiff was not violent, did not threaten her, and did not push Deinlein or her.  Id. ¶ 6.

Mack also recounts in his affidavit three incidents where white employees were involved in fights in the Owings Mills store but were not terminated.  Id. ¶¶ 7-9.  Defendant challenges the Mack Affidavit on the grounds that it goes beyond the scope of knowledge that was indicated in answers to interrogatories, is

---

[7] The Affidavit mistakenly identifies the date as April 25, 2015.

insufficiently attested to, and contains impermissible hearsay. Defendant also challenges two unsworn statements of Mack that are attached to his affidavit but are not authenticated by or even mentioned in the affidavit itself. Id. at 3, 4.

As to the first challenge, in the answers to interrogatories, Plaintiff identified Mack as one having knowledge that Jimmy Bennett was targeting Plaintiff for firing. Ans. to Interrog., ECF No. 107-3 at 5. In addition, Plaintiff notes that one of the unsworn statements that is attached to the Mack Affidavit, Attach. A, ECF No. 98-22 at 3, was actually produced by Defendant in discovery. This statement relates to a conversation between Bennett and Graham in which Graham stated that Plaintiff was a troublemaker who will try to cause problems at the Owings Mill store. The other attachment, Attach. B, id. at 4, was produced to Defendant on April 8, 2015, as part of a supplemental production. In this statement, Mack represents that Deinlein told him that Tlusty tried to get Deinlein to say that Plaintiff pushed him to the floor in order to "have something on" Plaintiff, even though it was not true that Plaintiff pushed him to the floor.[8]

---

[8] While the Court will find that these attachments are not admissible, Defendant's awareness of them undermines any argument that it lacked notice of the anticipated scope of Mack's knowledge.

As to statements (1), (2), and (3) above, the Court finds that Defendant was sufficiently put on notice that the general scope of Mack's knowledge included the content of these statements.  As to statement (4), Mack's assertion as to what Person was telling other employees about the incident, that statement would be beyond the anticipated scope of his knowledge.  Furthermore, unless Mack actually heard Person speaking with other employees, he would also lack personal knowledge of what she told others.[9]  The Court will also strike his statements about the three Caucasian employees that engaged in workplace violence but were not disciplined.  This evidence is of a different ilk than that of which Defendant had notice through discovery.

On the sufficiency of the attestation, Defendant suggests that Mack's affirmation is ambiguous because he signed the affidavit under the statement: "'[i]n accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under penalties of perjury and upon personal knowledge that the foregoing is true and correct to the best of my knowledge, information and belief.'"

---

[9] Without citing any authority for this proposition, Plaintiff argues that Mack's testimony regarding Person would be used as impeachment evidence and therefore did not need to be disclosed. While the Federal Rules may exempt from pretrial disclosure evidence that is "solely to be used for impeachment," Fed. R. Civ. P. 26(a)(3) (emphasis added), where impeachment evidence is also responsive to a particular discovery request, it must be disclosed. Newsome v. Penske Truck Leasing Corp., 437 F. Supp. 2d 431, 436-37 (D. Md. 2006).

ECF 107-1 at 9 (quoting ECF No. 98-22, emphasis added by
Defendant).  Addressing similar language, however, this Court
has found that "[t]he inclusion of the phrase 'to the best' does
not negate the fact that they signed the documents under penalty
of perjury, which the court can reasonably infer means the
affiants believed their statements to be true and correct and
based on personal knowledge."  Verrier v. Sebelius, Civ. No.
CCB-09-402, 2010 WL 1222740, at *4 (D. Md. Mar. 23, 2010).
Here, it is apparent from the substance of statements (1), (2),
and (3) that Mack has personal knowledge of what was said to him
in that he is relating conversations in which he was a
participant.

As to potential hearsay issues, these three statements do
relate to out of court statements that were made to Mack.
Portions of those statements, e.g., that Plaintiff was a
"troublemaker" or a "problem," are obviously not being offered
for the truth of the matter asserted.  Regardless, Mack is
relating statements made by individuals that were managers for
Defendant at the time those statements were made and, thus,
those statements are admissible as statements of an opposing
party.  See Fed. R. Evid. 801(d)(2)(D) (providing that a
statement is not hearsay if the statement is offered against an
opposing party and "was made by the party's agent or employee on

a matter within the scope of that relationship and while it existed").

The Court will strike paragraphs 6 through 9 of the Mack Affidavit.  In addition, the Court will strike the two unsworn statements that are attached to the Mack Affidavit.  In opposing the motion to strike, Plaintiff makes no argument for the admissibility of these statements.

### E. Affidavit of Anthony Wade (ECF No. 98-23)

Anthony Wade is an African American employee of Defendant and at one time was the manager of the meat department at the Owings Mill store.  He relates an incident where he discovered that a Caucasian meat cutter was stealing meat and he reported the theft to the store manager.  The meat cutter was suspended, the report was investigated by Tlusty, but Tlusty later claimed that the video evidence of the theft was missing so the investigation was discontinued.  The individual was later returned to work with full backpay.  While the offending meat cutter suffered no adverse impacts, Wade stated that, after reporting the theft, he was written up 38 times where previously he had no write ups and he was also transferred to another store.  Wade Affidavit ¶¶ 2-4.  He also reported a conversation with Person where she stated that Plaintiff was not violent and did not threaten or push her during the April 25, 2012, incident.  Id. ¶ 5.  He also states that he witnessed several

incidents where "the store manager show[ed] favoritism to white employees when they violate store policies."  Id. ¶ 6. Defendant challenges the Wade Affidavit on the same grounds as the Mack Affidavit.

As to the scope of Wade's knowledge disclosed in discovery, Plaintiff indicated that he would testify concerning the theft of meat by a Caucasian employee and the investigation of that theft. Ans. to Interrog., ECF No. 107-3 at 8.  His statements in paragraphs 2 through 4 would fall within the scope of that declared knowledge.  The remaining statements would not and accordingly will be stricken.

### F. Affidavit of Mark Robins[10] and Attached Statement (ECF No. 98-38)

Mark Robins worked with Plaintiff when Plaintiff was assigned to the Ellicott City store.  In his affidavit, he relates that Kunze permitted Caucasian employee Tiffany Mertes to work Sundays while on light duty but did not permit Plaintiff to do the same.  He also relates an incident where he allegedly observed Caucasian employee Christine Haley violate store rules by ringing up her sister's purchases and Kunze observing her doing so, whispering to her to stop, but taking no further

---

[10] This individual has been referred to in memoranda and exhibits as "Mark Robin," "Mark Robins," "Mark Robbin," and "Mark Robbins."  He signed his affidavit as Mark Robins and the Court will refer to him by that name.

disciplinary action.  Although not mentioned in or authenticated by the affidavit, attached to the affidavit is an unsworn statement of Robins that relates to those same incidents as well as another incident where both he and Plaintiff were unfairly written up for "not hitting the total button."  ECF No. 98-38 at 2.

Although Defendant contended in its motion that Plaintiff failed to produce the Robins Affidavit in discovery, it now concedes that Plaintiff did.  ECF No. 112 at 1.  Defendant also contends that the affidavit was not based on personal knowledge because of the language of the attestation[11] but it is clear that Robins is relating incidents that he would or could have readily observed in the Ellicott City store.  Defendant also makes the somewhat spurious argument that because Robins states that Kunze "approved and allowed Tiffany Mertes to work on Sunday's [sic] so she could receive overtime," ECF No. 112 at 8 (emphasis added by Defendant), that Robins was "claim[ing] to know the reasons for following specific decisions that Mr. Kunze is alleged to have made."  Id.  As Defendant's employee, Robins would have known that Sunday work resulted in overtime and thus he is simply reporting the result of Kunze's decision, not the motivation for that decision.

---

[11] The Robins Affidavit was signed under the same affirmation as the Easton Affidavit.

While the Court will strike the unsworn statement attached to the Robins Affidavit, it will not strike the affidavit itself.

### G. Statement of Maria Jones (ECF No. 98-36)

In this statement, dated February 25, 2012, Jones relates a conversation she had with Bennett in which Bennett related that Plaintiff was transferred to the Owings Mills store to be fired. Plaintiff states that this was a statement that Jones provided to the EEOC during the course of its investigation of Plaintiff's discrimination charge.  ECF No. 111 at 9.  Plaintiff acknowledges in his deposition that he collected this statement, along with the statements of Mack, Robins, Wade, and Deinlein, and then submitted them to the EEOC.  Pl.'s Dep. at 169-72, ECF No. 112-3.  He suggests, however, that these unsworn and unauthenticated statements are admissible because "these statements fall under the business records exception because they were kept in the ordinary course of business, and were not prepared and collected in anticipation of litigation."  ECF No. 111 at 9.

Plaintiff appears to be invoking an exception to the hearsay rule, commonly known as the business records exception,

set out in Rule 803(6) of the Federal Rules of Evidence.[12]   These statements, however, clearly do not fall within that exception. They were not prepared by the EEOC, but they were solicited and submitted by Plaintiff to the EEOC.   In addition, as Defendant notes, they were certainly prepared in anticipation of litigation in that their submission to the EEOC was the prerequisite to the filing of this lawsuit.   The statements have none of the indicia of trustworthiness on which the exception is premised.

Accordingly, the Court will strike the Jones Statement.

---

[12]   This Rule provides an exception to the rule against hearsay for "[a] record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

**H. Statement of Charles Deinlein Sr. (ECF No. 98-50)**

In his statement, Deinlein recounts that Bennett's plan from Bennett's first day at the Owings Mills store was to get rid of certain long term employees including Plaintiff, Maria Jones, Tony Mack, and Don Pardoe by picking on them for minor infractions in order to provoke anger and responses that could then be treated as insubordination.[13] This statement, dated June 2012, was also submitted by Plaintiff to the EEOC. Defendant challenges the admissibility of this statement on the grounds that it was not sworn under penalty of perjury and not authenticated. Plaintiff makes no response regarding the lack of authentication. As to the lack of a sufficient oath, Plaintiff simply states that the statement was "sworn and subscribed by a public notary" and, like the Jones statement, is a business record because it was submitted to the EEOC. ECF No. 111 at 9. Plaintiff's business record argument fails for the same reason it failed regarding the Jones Statement and a notary seal does not transform the statement into an admissible affidavit. See DeMars v. O'Flynn, 287 F. Supp. 2d 230, 242-43 & n.8 (W.D.N.Y. 2003) (finding letters that were notarized but not sworn to under penalty of perjury to be inadmissible, noting that a "notary public cannot convert an otherwise unacceptable [statement] into an affidavit merely by using the word 'sworn'

---

[13] Deinlein apparently is no longer in Defendant's employ.

25

and affixing a notary's stamp."); <u>Flowers v. Abex Corp.</u>, 580 F. Supp. 1230, 1233 n.2 (N.D. Ill. 1984) (noting that "[m]erely notarizing the signature does not transform a letter into an affidavit").

For these reasons, the Deinlein Statement will be stricken.

### I. Affidavit of Plaintiff (ECF No. 98-1)

Defendant levels a variety of challenges to Plaintiff's Affidavit, asserting that portions are inconsistent with Plaintiff's deposition testimony and/or are not based on personal knowledge and that the affidavit contains inadmissible hearsay.

Defendant points to two alleged inconsistencies between Plaintiff's Affidavit and his deposition.  First, Defendant asserts in its motion to strike that, in his deposition, Plaintiff testified that his retaliation claim was based upon a complaint he made to Graham in September of 2011, the day before Kunze issued him a disciplinary write up.  In his Affidavit, he repeats the statement that he complained to Graham in September 2011, Pl.'s Aff. ¶ 14, ECF No. 98-1, but adds that he also complained to Graham in January 2011.  <u>Id.</u> ¶ 12.  Defendant then takes umbrage that Plaintiff argues in his Opposition to the Summary Judgment Motion that his retaliation claim was based upon his January 2011 complaint.

Plaintiff responds that, in his deposition, he did not claim that the September 2011 complaint was his <u>first</u> complaint. In opposing the motion for summary judgment he argues that "[a]t least starting January 2011," ECF No. 98 at 32, he complained to Graham about Kunze and was then retaliated against.  The Court finds no inconsistency on this issue.

The second alleged inconsistency relates to a statement in Plaintiff's Affidavit that he had personal knowledge that a white employee, Aaron Lekarz,[14] pushed a shopping cart into an assistant manager and, while suspended for that conduct, was later reinstated with back pay.  Pl.'s Aff. ¶ 29.  In his deposition, however, Plaintiff stated that he did not see this incident but only heard about it later.  Pl.'s Dep. at 156, ECF No. 112-3.  The Court will strike the portion of paragraph 29 of Plaintiff's Affidavit related to the incident involving Lekarz.

Defendant also challenges the affirmation in Plaintiff's Affidavit, which is identical to that in the Wade and Mack Affidavits.  For the reasons stated above, the Court finds that affirmation sufficient and with few exceptions, the statements in the Affidavit are clearly based on personal knowledge. Plaintiff does state that Kunze "was not pleased" that other employees were approaching Plaintiff for assistance with

---

[14] In his Affidavit, Plaintiff identifies this individual as "Aaron Khazar."

grievances and complaints and, in response, "severely restricted [his] interactions with co-workers." Pl.'s Aff. ¶ 10. While Plaintiff would have personal knowledge of the severe restrictions and might reasonably infer the reason for them, he would not have had personal knowledge of Kunze's displeasure. The Court will strike Plaintiff's statement as to Kunze's state of mind.

With these evidentiary issues resolved, the Court now turns to the Motion for Summary Judgment.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing

party's] position" is insufficient to defeat a motion for summary judgment. Id. at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, Scott v. Harris, 550 U.S. 372, 378 (2007), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). As noted above, supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## B. Discussion

### 1. Racial Discrimination

In the absence of any direct evidence of intentional racial discrimination, Plaintiff's discrimination claims under Title VII and § 1981 are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." Tex. Dept. Cmty. Aff. v. Burdine, 450 U.S. 248, 248 (1981). Second, if the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate

some legitimate, nondiscriminatory reason" for the challenged action. McDonnell Douglas, 411 U.S. at 802. "[T]hird, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 248.

To establish a prima facie case of discrimination, Plaintiff must prove that: (1) he is a member of a protected group, (2) he suffered an adverse employment action, such as termination, (3) his job performance at the time of the adverse action or discharge met his employer's legitimate expectations, and (4) the circumstances of the adverse action or discharge raise a reasonable inference of unlawful discrimination. See e.g., Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995). Here, Plaintiff as an African American is a member of a protected class and at least some of the actions taken against him, about which he now complains, constitute adverse employment actions. An adverse employment action is one that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007). The denial of Sunday work with the attendant double pay and his suspension without pay for purchasing the DVD could constitute

30

adverse employment actions, and the termination of his employment
certainly would constitute an adverse employment action.  On the
other hand, the assignment of tasks that Plaintiff found
undesirable, the issuance of disciplinary write-ups, and his
transfer to another store would not.  Nye v. Roberts, 159 F. Supp.
2d 207, 213-14 (D. Md. 2001) (finding a written reprimand did not
constitute an adverse employment action because "reprimands do not
automatically affect the terms and conditions of employment" and
the reprimand did "not state that it would lead to her termination
or demotion or a decrease in pay").  Plaintiff, in fact, at least
initially viewed his transfer to the Owings Mill store as a "good
thing" because it was closer to his home.  Pl.'s Dep. at 94.

     The Court finds that there is a dispute of fact as to whether
Plaintiff's work performance was meeting Defendant's expectations.
Plaintiff points to the last Performance Appraisal he received
before his termination, dated March 30, 2011, which reflects a
uniformly positive evaluation: Plaintiff is "very helpful," "works
hard," "works well with his peers," "knows and understands the
technical aspects of his job," and his supervisor concluded that
Plaintiff "is a hard worker even while he is on light duty.  He is
an asset to our team."  ECF No. 98-3.  In contrast, as evidence
that Plaintiff was not meeting expectations, Defendant points to
Plaintiff's violation of its "Rapport Program," Plaintiff's one-
day-too-early purchase of the Planet of the Apes DVD, and the April
25, 2012, incident in the management office.  As reflected in the

evidence reviewed above and as discussed more fully below, however, there is at least some question as to whether these are truly examples of deficient performance warranting the adverse actions taken or were instead part of a plan to manufacture a reason to terminate Plaintiff's employment.

While Plaintiff might be able to establish the first three elements of the prima facie of a race discrimination claim, the Court finds that there is insufficient evidence from which a jury could reasonably infer that the adverse actions were taken against Plaintiff because of his race. As to whether there was any racial bias in the assignment of Sunday hours, Plaintiff focuses on two Caucasian employees that were given Sunday shifts while on light duty, but Defendant notes in its Motion for Summary Judgment that an African American employee, Dinah Burns, was also assigned Sunday hours while on light duty. Kunze Aff. ¶ 9, ECF No. 11. Plaintiff does not dispute that representation. Furthermore, Plaintiff does not dispute that he was given Sunday hours both before and after being placed on light duty status and that, when he returned from workers' compensation leave, he brought a note from his health care provider stating that he should work no more than 40 hours a week, ECF No. 88-31 (Verification of Treatment dated 9/13/11). Since Plaintiff was a full time employee scheduled for 40 hours a week, working a Sunday shift would have placed him over that limit.

Plaintiff does posit that Defendant's reason for denying him Sunday work changed over time and suggests that this shifting

32

reasoning is evidence of pretext.  Opp'n at 32–33, ECF No. 98.   In
one "Statement of Position" submitted by Defendant to the EEOC, it
stated that, if the two Caucasian employees were given Sunday work
while on light duty, it was in error, ECF No. 98-10 at 3, but in
another Defendant stated that the two Caucasian employees were
given Sunday work because they had greater seniority than
Plaintiff.  ECF No. 98-9 at 2.  In the Motion for Summary Judgment,
Defendant pointed to the restrictions imposed by Plaintiff's
doctor.  While this shifting rationale might be evidence of
pretext, it provides no evidence that the real reason was racial
discrimination, particularly in light of the undisputed fact that
another African American employee on light duty was given Sunday
shifts.  See Adams v. Trustees of Univ. of North Carolina-
Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating
the Defendants' decision was pretext, [plaintiff] had to prove both
that the reason was false, and that discrimination was the real
reason.").

     Nor is there any evidence that his suspension for the purchase
of the DVD was racially motivated.  Plaintiff highlights that the
Caucasian employee that assisted him with the checkout, Tiffany
Mertes, was not disciplined.  First, it is not clear that Mertes
knew that the DVD was not yet on sale when she helped Plaintiff
with the purchase.  Mertes needed to assist Plaintiff with the
purchase in order to clear a different movie that Plaintiff decided
he did not want.  ECF No. 98-15.  When she later realized the

Planet of the Apes DVD was purchased prematurely, she reported the sale to Kunze.  Under those circumstances, Defendant had no reason to discipline Mertes.

Plaintiff also points to other Caucasian employees that violated various store policies but were not similarly disciplined. For example, he notes that white cashier Christine Haley was not disciplined for ringing up a family member and that two other white employees who violated Defendant's Club Card policy by swiping non-customer Club Cards were only given written warnings.  Opp'n at 21-22.  It is not clear that these violations are as serious as Plaintiff's as there is no evidence that the employees received any personal gain as a result of the violations.  Regardless, Defendant has submitted evidence that both Caucasian and African American employees who swiped non-customer Club Cards were treated equally, i.e, both Caucasian and African-American employees received written warnings for repeated violations.  Tlusty Aff. ¶¶ 3-7, ECF No. 106-3.[15]

Most significantly, the Court notes that Plaintiff states that when was he was suspended, he "protested to Mr. Kuntz (sic) that

---

[15] In her affidavit, Leslie Easton did make broad statements that African American employees were disciplined more severely than white employees.  ECF No. 98-39 ¶¶ 8, 10.  While the Court did not strike these statements, they are, as noted above, of such a generalized and subjective nature that they carry little if any weight.  To defeat a motion for summary judgment, the party opposing the motion must present evidence of <u>specific facts</u> from which the finder of fact could reasonably find for him or her. <u>Anderson</u>, 477 U.S. at 252; <u>Celotex</u>, 477 U.S. at 322-23.

the action <u>was in retaliation</u> due to [Plaintiff's] October 2011,
EEOC charge of discrimination."  ECF No. 98 at 6 (emphasis added).
Thus, Plaintiff himself attributed the action to retaliation, not
to racial discrimination.  While a jury might conclude that a three
week suspension for conduct that caused Defendant no harm is unduly
harsh, they could not reasonably conclude it was a result of racial
bias.

Similarly, there is no evidence upon which a jury could
reasonably conclude that the termination of Plaintiff's employment
for the alleged violation of Defendant's zero-tolerance Workplace
Violence Policy was racially based.  Defendant submitted evidence
of 11 non-African American employees whose employment was
terminated after an incident of workplace violence.  Tlusty Aff. ¶
22, ECF No. 88-12 (identifying employees terminated for workplace
violence); Page Aff. ¶ 5, ECF No. 88-9 (identifying the race of
those employees).  In response, Plaintiff points to six Caucasian
employees that he alleges engaged in similar acts of workplace
violence but were less severely disciplined.  ECF No. 98 at 22-23.
For each incident, Plaintiff provided the detailed "Investigation
Summary" prepared by Defendant.  ECF Nos. 98-41 to 98-46.
Reviewing those summaries, there are some superficial similarities
between those incidents and the April 25, 2012, incident involving
Plaintiff.  There are also significant dissimilarities.  <u>See</u> Reply
at 10-11, ECF No. 106.

Several of the incidents involved only a verbal exchange with no physical contact.  In others where there was physical contact, Graham, who investigated all of the incidents and made the disciplinary determination, concluded that the contact was inadvertent.  For all but one incident, there was no manager present to observe the interaction and for several, there was no witness whatsoever other than the accuser.  In the one instance where an assistant manager was involved, the employee was suspended for allegedly pushing a cart into that assistant manager.  Another employee who was present at the time, however, stated that he never saw the other employee push the cart into the manager.  ECF No. 98-44.  Furthermore, several of the individuals cited by Plaintiff were suspended pending investigation and several were transferred to another store as the outcome of the investigation.

In contrast to these incidents, after investigating the April 25 incident, Graham concluded that Plaintiff intentionally pushed Assistant Manager Deinlein and bumped into Person in the presence of two managers.  Most significantly, the individual who investigated all of these incidents, made the factual findings, and was the primary decision-maker in Plaintiff's termination is, as noted above, African American.  That alone seriously undermines any inference that Plaintiff was disciplined differently because of his race.  See Demesme v. Montgomery County Gov't, 63 F. Supp.2d 678, 683 (D. Md. 1999) ("The fact that the decisionmakers were of the same protected class suggests no discriminatory motivation.");

Jackson v. The School Bd. of the City of Richmond, Case No. 99-642, 2000 WL 34292578, at *7 (E.D. Va. Mar. 15, 2000) ("Proof that the decisionmaker is a member of the same protected class as [the plaintiff] weakens any possible inference of discrimination.").[16]

In his opposition, Plaintiff makes a half-hearted argument that Graham "was not the only decision maker and not the ultimate decision maker." Opp'n at 27, ECF No. 98.  The entirety of his argument on that point is this sentence: "Instead her decision was coordinated with her white superiors, including Mr. Matthews, the HR manager, labor relations manager Madert and District Director Brian Caudle." Id.  As evidentiary support for that argument, Plaintiff cites Graham's Affidavit in which Graham stated that she and "Tim Matthews, [her] former supervisor" determined that Plaintiff should be issued a write up for the DVD purchase, Graham Aff. ¶ 18, and that she "consulted with Mr. Matthews in the decision to terminate [Plaintiff]." Id. ¶ 30.[17]  Nothing in the record, however, reflects that Graham had or voiced any disagreement with the decision to terminate Plaintiff's employment or was in any way pressured to reach that conclusion.

---

[16] In addition, the individual with whom Plaintiff had the confrontation, Ms. Person, is also African American.  Furthermore, to the extent that Plaintiff sees this as part of Bennett's plan to get him fired, Bennett's race also undermines any racial motivation to this event.

[17] Plaintiff also cites Graham's deposition in which she recounts that Defendant's "Labor Relations" department overruled her recommendation to terminate the employment of Aaron Lekarz.  ECF No. 98-17 at 71-72.

Plaintiff's own arguments concerning Graham's role further undermine any inference that discrimination based upon race was motivating her decisions.  Plaintiff proffers, "assuming arguendo that Ms. Graham was the decision maker, this raise (sic) a genuine issue of material fact as to the true reasons for the disciplinary actions.  She was the point person defending Safeway against Plaintiff's October 2011 EEOC charges . . . ."  Opp'n at 27, ECF No. 98.  He also argues that, "[e]ven if Ms. Graham was the real decision maker, a jury should decide if . . . the articulated reasons for the disciplinary actions were influenced and motivated by her role and duty in protecting and defending Safeway against Plaintiff's EEOC discrimination claim."  Id. at 29.  Actions taken to protect or defend Defendant from EEOC charges implicate retaliatory, not racially discriminatory, motives.

For all these reasons, the Court finds that no reasonable jury could conclude that Plaintiff was disciplined and ultimately fired because of his race.

### 2. Retaliation

The Court reaches a different conclusion as to Plaintiff's retaliation claim.  As an initial observation, although both Plaintiff and Defendant analyzed the retaliation claim under the McDonnell Douglas burden shifting framework, there is at least some question as to whether that analysis was necessary.  Courts turn to this framework when there is no direct evidence of retaliation. Here, there is evidence that Plaintiff's manager, Jimmy Bennett,

openly stated to others that Plaintiff was considered a
"troublemaker" and a "problem employee" and that Defendant
transferred Plaintiff to Bennett's store so that Plaintiff could be
fired.  That Bennett stated that Defendant wanted Plaintiff fired
by an African American manager so that he could not make a claim of
discrimination strongly suggests that Plaintiff's status as a
troublemaker or problem employee stems from his previous claims of
discrimination.  Tony Mack stated that, in his conversation with
Bennett, Bennett specifically tied Plaintiff's troublemaker status
to Plaintiff's EEOC Complaint.  Mack Aff. ¶ 3, ECF No. 98-22.  That
conclusion is also consistent with Graham's inquiries of Daniels-
Gordon as to whether and why Plaintiff was aware of Daniel-Gordon's
complaint of discrimination.[18]

Assuming though, that analysis under the McDonnell Douglas
burden-shifting framework is necessary, the prima facie case of
retaliation under Title VII that Plaintiff must establish is that:
(1) he engaged in protected activity; (2) Defendant took adverse
employment action against him; and (3) there was a causal
connection between the protected activity engaged in by Plaintiff
and the alleged adverse action.  Holland v. Washington Homes, Inc.,

---

[18] The Court does note, however, that the conclusion that the
plan to fire Plaintiff was in response to Plaintiff's
discrimination claim would be undercut somewhat by evidence
submitted by Plaintiff (but struck by the Court) that Bennett
was sent to the Owings Mills store to "get rid of any long term
employees."  Deinlein Aff., ECF No. 98-50.  This would imply
that Bennett was targeting employees for reasons other than the
employees' involvement in protected activity.

487 F.3d 208, 218 (4th Cir. 2007).  Defendant makes no argument that Plaintiff did not engage in protected activities.  Focusing only on complaints made on his own behalf, Plaintiff complained to Graham in January and September 2011 that Kunze was discriminating against him in the assignment of Sunday shifts, Plaintiff filed a charge with the EEOC and a grievance for racial discrimination with his union in October 2011, and Plaintiff updated his EEOC charge and participated in a fact finding meeting at the EEOC in April 2012.

The standard for establishing an adverse employment action in the context of a retaliation claim "is less 'strenuous' than the standard in a discrimination claim," because "[t]he adverse employment action in a retaliation case need not affect an employee's 'terms or conditions of employment.'"  Madock v. McHugh, No. ELH-10-2706, 2011 WL 3654460, at *26 (D. Md. Aug. 18, 2011) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70 (2006)).  Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. (citations and quotation marks omitted)).  Even under that lower standard, the assignment of less desirable tasks than Plaintiff was used to or the issuance of written warnings would not rise to the level of adverse employment actions.  See Thorn v. Sebelius, 766 F. Supp. 2d 585, 600 (D. Md. 2011) ("not

every uncomfortable moment in the workplace will constitute an adverse action.  'An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights and minor annoyances that often take place at work.'") (quoting Burlington, 548 U.S. at 68).  The suspension without pay, and the termination of employment, of course, would.

The Court also concludes that a jury could find a causal connection between Plaintiff's protected activities and the adverse employment actions taken against him.  There is little question that the decision makers, including Graham, were aware of Plaintiff's activities.  Plaintiff complained directly to Graham about Kunze's discriminatory treatment, Graham received the Notice of Charge of Discrimination in October of 2011, and then received more detailed information about the nature of Plaintiff's EEOC claims after Plaintiff inadvertently emailed Defendant's attorneys and those attorneys forwarded Plaintiff's email to Graham.

The Court also finds that there is sufficient temporal proximity between the protected activities and the adverse employment actions to create an inference of causation.  See Jenkins v. Gaylord Entm't Co., 840 F. Supp. 2d 873, 881 (D. Md. 2012) (noting that "temporal proximity between an employer's knowledge of protected activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is 'very close'").  Here, Plaintiff's protected activity had a somewhat continuing nature.  In the period leading

up to Plaintiff's suspension over the purchase of the Planet of the
Apes DVD, Plaintiff had complained to Graham in September 2011,
filed the EEOC charge and union grievance in October 2011, and met
with Graham on or about November 22, 2011.  He was then suspended
on December 13, 2011.  His complaints of discrimination continued
through the period leading up to his suspension and ultimate
discharge for the alleged workplace violence episode.  He updated
his EEOC charge on April 4, 2012, had a meeting with the EEOC at
which Graham was present on April 24, 2012, and was then suspended
the very next day.  In early June of 2012, Defendant's attorneys
forwarded to Graham Plaintiff's email concerning his discrimination
claims against Defendant and Plaintiff's employment was then
terminated on July 16, 2012.  Beyond this temporal connection,
there is the evidence that, if believed by the jury, would
establish that Plaintiff's manager was telling others that
Defendant was setting him up to be fired for being a trouble maker.

    Drawing all inferences in Plaintiff's favor, a jury could find
that Plaintiff has established a prima facie case of retaliation.
Once a plaintiff has done so, then the burden shifts to the
defendant to show that its purportedly retaliatory action was in
fact the result of a legitimate non-retaliatory reason.  Foster v.
Univ. of Maryland-Eastern Shore, 787 F.3d 243, 250 (4th Cir. 2015).
"If the employer makes this showing, the burden shifts back to the
plaintiff to rebut the employer's evidence by demonstrating that
the employer's purported nonretaliatory reasons 'were not its true

reasons, but were a pretext for discrimination.'"  Id. (quoting

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143

(2000)).  To carry this final burden, "a plaintiff must establish

both that the employer's reason was false and that retaliation

was the real reason for the challenged conduct."  Id. at 252

(internal quotations and alternations omitted).

As to the non-retaliatory reasons for the adverse

employment actions taken against Plaintiff, Defendant cites

Plaintiff's alleged violations of two policies: for the three

week suspension for the one-day-too-soon purchase of the DVD,

its policy that employees be treated as any other customer; and

for the April 25, 2012, suspension and July 16, 2012,

termination, its zero-tolerance Workplace Violence Policy.  The

validity of each justification, however, turns, at least in

part, on credibility determinations that are not appropriate at

this stage of the litigation.  Defendant claims that Plaintiff

took the DVD out of a box that was clearly marked "**DO NOT SELL**

**BEFORE TUESDAY DEC. 13, 201[1].**"[19]  Mot. at 12, ECF No. 88-1

(citing ECF No. 88-26).  If true, Defendant could have concluded

that Plaintiff knowingly violated a store policy.  Plaintiff,

however, asserts that he was not aware that the DVD was not

---

[19] In its motion, Defendant misquoted the label as "**DO NOT SELL**
**BEFORE TUESDAY DEC. 13, 2014.**"

available for purchase.  Pl.'s Aff. ¶ 19.[20]  If the jury credits

that testimony, Plaintiff's violation was inadvertent and a

three week suspension without pay might seem extreme.

As to the suspension and termination for the alleged act of

workplace violence, Plaintiff's version of the events is

completely at odds with the version advanced by Defendant.

Plaintiff paints Person as the aggressor and any physical

contact with Deinlein or Person was incidental to his effort to

extricate himself from the situation.  Defendant paints

Plaintiff as the aggressor.  It is true, as Defendant argues,

that Defendant's version is supported by the testimony of the

three other witnesses who were present.  Nevertheless, one of

those witnesses, Person, had a motivation to deflect

responsibility onto Plaintiff so that she would not be

disciplined and there is evidence that Deinlein was pressured by

Tlusty to exaggerate Plaintiff's aggression.  Mack Aff. ¶ 5, ECF

No. 98-22.  This, coupled with declarations by Bennett that

there was a plan to so aggravate Plaintiff that he would be

provoked into doing something that would get him fired, leads

the Court to conclude that a jury could find that Defendant used

the events of April 25, 2012, simply as a pretext to fire

---

[20] Plaintiff's position in this regard is somewhat suspect.  It
appears that Plaintiff initially stated that he picked the DVD
up off of a shelf in the store, see ECF No. 88-12 at 15, but
only later acknowledged that he took it out of a box in the
backroom.  Id.

Plaintiff in retaliation for his troublesome complaints of discrimination.[21]

## IV. CONCLUSION

For the reasons stated above, both Defendant's Motion to Strike and Motion for Summary Judgment will be granted in part and denied in part.  The case will proceed only as to Plaintiff's retaliation claim under Title VII (Count Two).  An order consistent with this memorandum will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: March 30, 2016




---

[21] The Court notes that a plaintiff can go forward with a retaliation claim under Title VII even where his discrimination claim is found to be without merit.  See Ross v. Communications Satellite Corp., 759 F.2d 355, 357 n.1 (4th Cir. 1985) ("An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to the perceived discrimination."); Young v. Giant Food Stores, LLC, 108 F. Supp. 3d 301, 315-16 (D. Md. 2015) ("[A] plaintiff pursuing a Title VII retaliation claim need not show that the activity he opposed has, in fact, contravened some aspect of Title VII.  Rather, he must simply have a reasonable belief that Title VII has been — or is in the process of being — violated by the activity being opposed.").