```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND


STEPHEN COLFIELD                *
                                *
v.                              *    Civil Action No. WMN-12-3544
                                *
SAFEWAY INC.                    *

    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

**MEMORANDUM AND ORDER**

On March 30, 2016, this Court issued a Memorandum, ECF No. 114, and Order, ECF No. 115, granting in part and denying in part Defendant Safeway Inc.'s Motion for Summary Judgment. The Court granted the motion as to Plaintiff Stephen Colfield's racial discrimination claims, but denied the motion as to his retaliation claim. Defendant filed a timely motion under Rule 54(b) of the Federal Rules of Civil Procedure asking the Court to reconsider its decision regarding the retaliation claim. ECF No. 119. The Court will deny that motion.

Under Rule 54(b), a district court can revise any order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." See Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003). This Court's March 30, 2016, Memorandum and Order was such an interlocutory judgment. Resolution of a motion for reconsideration of such a judgment is "committed to the discretion of the district court," id. at 515, and the goal "is

to reach the correct judgment under law." Netscape Communications Corp. v. ValueClick, Inc., 704 F. Supp. 2d 544, 547 (E.D. Va. 2010) (internal citations omitted).

Defendant's motion begins with a somewhat inaccurate characterization of this Court's ruling on the summary judgment motion. Defendant declares that "[t]he Court acknowledged that the termination of Plaintiff's employment was for legitimate non-discriminatory reasons because Plaintiff had engaged in workplace violence." ECF No. 119-1 at 1 (citing ECF No. 114 at 35-37). In the referenced portion of the opinion, the Court concluded that "there is no evidence upon which a jury could reasonably conclude that the termination of Plaintiff's employment for the alleged violation of Defendant's zero-tolerance Workplace Violence Policy was racially based." ECF No. 114 at 35 (emphasis added). While the Court concluded that a jury could not find that Plaintiff's termination was racially motivated, it did not conclude that Plaintiff was terminated for a "legitimate" reason.

In that portion of its opinion, the Court did note that Karen Graham, the primary decision maker in Plaintiff's termination, "concluded that Plaintiff intentionally pushed Assistant Manager Deinlein and bumped into [Tia] Person . . . ." during the April 25, 2012, incident that lead to the termination of Plaintiff's employment. Id. at 36. The Court also opined

that, because Graham, like Plaintiff, is African American, "[t]hat alone seriously undermines any inference that Plaintiff was disciplined differently because of his race." Id. (emphasis added). As the following portion of the Court's March 30, 2016, opinion made clear, however, the Court also found that there is at least a dispute of fact as to whether Graham reached that conclusion honestly or, instead, as a convenient pretext to terminate Plaintiff in retaliation for his troublesome complaints of discrimination made on behalf of himself and other employees. See id. at 38-45.

Defendant also raises several specific concerns with this Court's ruling on its summary judgment motion which the Court will briefly address. First, Defendant makes much of the fact that Tony Mack may have confused the order in which Plaintiff and Jimmy Bennett were transferred to Defendant's Owings Mills store. ECF No. 119-1 at 5-8. Mack stated in his affidavit that Bennett, who is African American, told him that he was sent to the Owings Mills store to fire Plaintiff so that Plaintiff would not be able to claim discrimination. ECF No. 98-22 ¶ 3.[1]

---

[1] Defendant mischaracterizes Mack's statement as attributing to Bennett the statement that "he was transferred to Plaintiff's store for the sole purpose of terminating Plaintiff's employment." ECF No. 123 at 12 (citing ECF No. 99-22, Mack Aff. ¶ 3). What Mack stated was that, in December 2011, Bennett "was transferred to Owings Mills" and later disclosed to Mack that he was "sent to the store in part to fire [Plaintiff]"). Mack Aff. ¶ 3 (emphasis added).

3

Defendant notes that Graham stated in her affidavit that "Bennett was actually transferred to the Owings Mills Store in November 2011 – three[2] months ***before*** Plaintiff was transferred to the store in January 2012." ECF No. 119-1. In its Reply memorandum, Defendant suggests that this timing issue "does not square with Plaintiff's entire theory of the case," and that the fact that "Bennett was actually transferred to the Owings Mills Store months prior to Plaintiff" is "a fact that Plaintiff has, until now, overlooked." ECF No. 123 at 12-13.

Plaintiff, however, has represented all along that Bennett was already at the Owings Mills store before Plaintiff was transferred there. In an April 4, 2012, letter to the Equal Employment Opportunity Commission (EEOC), Plaintiff wrote that he had been moved to a store that had a black co-manager, Jimmy Bennett, so that he could be fired and any claim of discrimination would be discredited. ECF No. 98-1, Attach. A at 1. In his opposition to the motion for summary judgment, Plaintiff stated that, in December 2011, when he first learned that he was to be transferred, he "immediately recalled information that in November 2011, an African American was transferred to Owings Mills as an Assistant store manager." ECF

---

[2] While perhaps not particularly relevant, Plaintiff was transferred to the Owings Mills store effective January 3, 2012, so, if Graham's representation is correct, Bennett was transferred at most two months before Plaintiff.

4

No. 98 at 16.  The Court, as Defendant acknowledges, recognized that Plaintiff was asserting that he was transferred to a store where Bennett was already an assistant manager.  See ECF No. 114 at 39 (noting that there was evidence that "Defendant transferred Plaintiff to Bennett's store so that Plaintiff could be fired") (emphasis added).  The issue is not, and has never been, who was transferred first.

Defendant next takes issue with the Court's citation to Rashida Daniels-Gordon's affidavit as evidence of a retaliatory motive on the part of Graham.  ECF No. 119-1 at 8-9; ECF No. 123 at 12.  In her affidavit, Daniels-Gordon recounts a meeting she had with Graham, a meeting that she was told was for the purpose of investigating a sexual harassment complaint she had made against Bennett.  Defendant posits that there was nothing unusual about this interview and that "it was natural for a Human Resources Manager to ask employees to keep their investigations confidential" and "to not involve others in this HR investigation."  ECF No. 123 at 12.  Defendant questions "[h]ow could one possibly infer a retaliatory motive" from the exchange, and noted that the meeting occurred "after Plaintiff had already engaged in workplace violence."  ECF No. 119-1 at 9.

Defendant conveniently ignores what Daniels-Gordon actually said in her affidavit.  Daniels-Gordon stated that while Graham told her the meeting was about the sexual harassment claim,

5

Graham "focused her questions on [Plaintiff]."  ECF No. 98-37 ¶ 7.  Graham did not simply ask her to keep the investigation confidential, she threatened to fire her if she told anyone about this meeting, especially Plaintiff.  Id. ¶ 10.  Defendant also omits mention that Graham warned Daniels-Gordon that Plaintiff "was trying or may try to use [her] to benefit himself in something he was trying to do," id., a comment that borders on a breach of the confidentiality concerns that Defendant asserts a Human Resources Manager would naturally seek to enforce.  As for the timing of this conversation, while it occurred after the alleged incident of workplace violence, it took place immediately before the decision was made to terminate Plaintiff's employment.

Defendant next criticizes the Court for failing to consider comparator evidence when evaluating Plaintiff's retaliation claim.  As the Court explained in its previous decision, given that there is some direct evidence of retaliation, it was at least questionable as to whether the Court needed to engage in the McDonnell Douglas analysis, an analysis which would have encompassed that comparator evidence.  ECF No. 114 at 38-39.  In its reply in support of the motion for reconsideration, Defendant argues that Bennett's alleged statement that he was tasked to fire Plaintiff because Plaintiff was a troublemaker was not sufficiently related to his termination to constitute

6

direct evidence of retaliation.  ECF No. 123 at 10-11 (citing Betof v. Suburban Hosp., Inc, Civ. No. 11-1452, 2012 WL 2564781 (D. Md. June 29, 2012)).[3]

In Betof, a case alleging racial discrimination, this Court did hold that "[d]irect evidence is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  2012 WL 2564781, at *6 (internal quotation omitted).  In Betof, the statements that plaintiff asserted were direct evidence of racial discrimination, this Court found were, "in fact, racially neutral" and were not "in any way linked to [plaintiff's] subsequent termination."  Id. For those reasons, the Court found the statements were not direct evidence of discrimination.  In contrast, here we have a statement of one of Defendant's managers that Defendant wanted Plaintiff fired because of his troublesome EEOC activity.[4]

---

[3] Defendant also argues that Graham's comments to Daniels-Gordon are not direct evidence of retaliation.  The Court agrees.  The Court mentioned Graham's comments simply as further support for the conclusion that Plaintiff was labeled a troublemaker because of his EEOC complaints.  See ECF No. 114 at 39.

[4] Defendant argues that Bennett's statements regarding Plaintiff being a troublemaker and his plan to set-up Plaintiff for termination were "not at all related" to Plaintiff's termination because Bennett was not involved in that termination.  ECF No. 123 at 11.  The Court notes that it was Bennett, who was Acting Store Manager at the time of the April 25, 2012, incident, who told Assistant Manager Angela Corprew to report the incident to Allen Tlusty for investigation.  ECF No. 88-12 at 32.

While questioning if it was necessary, the Court did evaluate Plaintiff's retaliation claim under the McDonnell-Douglas framework.  In that evaluation, the Court did not discuss comparators because, particularly as to Plaintiff's termination based upon the April 25, 2012, incident, there is a question as to what the conduct of Plaintiff actually entailed that would then be compared to the conduct of other employees.  The Court found, and still finds, that there are material disputes of fact as to whether Plaintiff engaged in workplace violence.

Defendant suggests that Plaintiff admitted that he committed an act that violated Defendant's Workplace Violence Policy.  ECF No. 119-1 at 12; ECF No. 123 at 9.  Selectively quoting from a "Statement and Grievance" written by Plaintiff regarding the incident, Defendant states that Plaintiff admitted "that he 'argued' with Ms. Person, 'point[ed] his finger at her,' 'bump[ed]' her and 'pushed [Mr. Deinlein's] hands.'"  ECF No. 119-1 at 12 (quoting ECF No. 88-19).  From this, Defendant concludes Plaintiff committed an "egregious act of workplace violence."  ECF No. 119-1 at 7.

What Plaintiff recounted in his Statement and Grievance was that, in response to Person lying and accusing Plaintiff of talking about her, he "started pointing [his] finger at her."  ECF No. 88-19.  She told him not to point his finger and he told

8

her to stop lying.  In frustration, he started to walk out of the office when Deinlein "grabbed me very hard on my left shoulder and bruised it, [and] I pushed his hand off of me." Id.  When he started to leave the office again, Person "decided to block me from leaving by standing in my way and refusing to move."  Id.  After he told her to move and she would not, "in order to walk out I was forced to bump shoulders with her since she wouldn't move and continued to stand in my way knowing that I was trying to leave."  Id.  He concluded, "I didn't put my hands on her, I didn't challenge her and didn't curse or threaten her, I simply attempted to leave."  Id.

    Beyond mischaracterizing Plaintiff's "admission," Defendant focuses on the accounts of the incident provided by other employees who were present.  While those other accounts differ in the level of physical force asserted by Plaintiff, they recount a similar course of events: raised voices, finger pointing, Deinlein inserting himself between Plaintiff and Person, Plaintiff pushing Deinlein's arm away, and Plaintiff bumping into Person as he leaves the office.  Reviewing those accounts, Graham certainly could have honestly concluded that Plaintiff violated Defendant's zero tolerance workplace violence policy.  If, however, the jury credits the testimony that (1) Bennett was tasked to fire Plaintiff because of his EEOC activity; (2) Allen Tlusty, the individual that investigated the

9

incident, prodded and forced Deinlein to alter his account of the incident to implicate Plaintiff; and (3) Graham, when interviewing Daniels-Gordon, seemed more concerned with investigating Plaintiff than Daniels-Gordon's complaint against Bennett, the jury could also find that, but for her desire to find a justification to terminate a troublesome employee, Graham would have reached a different conclusion.

The Court's denial of Defendant's motion for reconsideration should not be read to imply that the Court believes that Plaintiff will have an easy job convincing a jury that he was retaliated against for asserting discrimination claims on behalf of himself and others.[5]  Bennett, whom Plaintiff identifies as the individual tasked with getting rid of him, did not appear to have a central role in his suspension or termination.  Furthermore, given that Bennett was himself terminated by Defendant for sexual harassment, his credibility is certainly undermined.

---

[5] The Court concludes that Plaintiff will have an even more difficult task convincing a jury that his suspension and transfer for purchasing a DVD before it was released for sale was retaliatory.  The Court notes that Plaintiff's accounts of his conduct regarding that purchase are somewhat inconsistent.  Nevertheless, because the case will go forward on the discharge for workplace violence claim and the suspension and transfer for the DVD purchase provide the background and context for the discharge claim, the Court will not enter judgment on that portion of the retaliation claim at this time.  The Court might reach a different conclusion in ruling on a motion for judgment after hearing the evidence at trial.

For these reasons, and for the reasons more fully stated in this Court's Memorandum of March 30, 2016, IT IS this 17th day of August, 2016, by the United States District Court for the District of Maryland, ORDERED:

(1) That Defendant's Motion for Reconsideration, ECF No. 119, is DENIED; and

(2) That the Clerk of the Court shall transmit a copy of this Memorandum and Order to all counsel of record.

```
                 _____/s/_____
                 William M. Nickerson
                 Senior United States District Judge
```